JOURNAL ENTRY and OPINION
{¶ 1} Appellant Laron Pace appeals his conviction rendered after a bench trial. On appeal, he assigns the following errors for our review:
"I. The trial court was without jurisdiction to conduct a bench trial because the requirements of R.C. 2945.05 were not strictly followed."
"II. The trial court erred in denying appellant's motion to suppress."
"III. The guilty verdict is against the manifest weight of the evidence."
 {¶ 2} Having reviewed the record and pertinent law, we affirm the trial court's decision. The apposite facts follow.
 {¶ 3} The Cuyahoga County Grand Jury indicted Pace for one count of attempted murder, with one and three-year firearm specifications, a repeat violent offender specification, and a notice of prior conviction. In addition, the Grand Jury indicted Pace for two counts of felonious assault and one count of having a weapon while under disability. Pace pled not guilty at his arraignment, and subsequently filed a motion to suppress written and oral statements made after his arrest. The trial court denied the motion to suppress. Thereafter, Pace waived his right to a jury trial, and on June 9, 2004, a bench trial commenced.
 {¶ 4} At trial, the victim, Frank Brown, testified that on January 7, 2002, he was visiting a female friend at the Longwood Estates in Cleveland, Ohio. While visiting his friend, he went outside and stood in an area where he normally sold drugs. He encountered Pace, said hello, but Pace gave him a mean-spirited look. A few minutes later, Brown returned to his friend's apartment.
 {¶ 5} At approximately 2:45 A.M., while Brown was leaving the apartment, he encountered Pace in the hallway. Pace pulled out a gun and shot him in the left leg. As Brown turned to run, Pace continued to shoot, hitting him in the left buttock, back, and right leg. Brown fled to the building's security office, where police officers are routinely stationed. An officer called an ambulance, which took Brown to the hospital. At the hospital, Brown told the police that "Ron" had shot him.
 {¶ 6} Upon Brown's release from the hospital, he surrendered to authorities in connection with a federal drug investigation. After a plea agreement, Brown was sentence to 57 months for conspiracy to distribute more than 5 kilograms of crack cocaine. Detective Michael Alexander, of the Cleveland Police Department, took Brown's statement while Brown was in federal prison. He also showed Brown a photographic array, and Brown identified Pace as his assailant. Brown told Detective Alexander that even though he grew up with Pace and saw him around the neighborhood on a daily basis, he never knew his last name.
 {¶ 7} Finally, Brown testified he has had six felony convictions within the past ten years for drug trafficking, drug possession, drug abuse, carrying a concealed weapon, and receiving stolen property.
 {¶ 8} Officer Jeffrey Petkac, of the Cleveland Police Department, testified he was the first officer to respond to the shooting. He arrived to find Brown laying on the floor, covered with blood, and screaming. After speaking with Brown, Petkac learned that an individual named Ron had shot him. Brown told him Ron lived in Unit 3. Petkac went to the apartment building, where he found .380 caliber shell casings scattered inside and outside the building. Petkac questioned Ronald Wofford, and upon searching the apartment, recovered a .380 automatic pistol. Subsequently, Petkac arrested Wofford, but did not charge him with Brown's shooting.
 {¶ 9} In the latter part of 2002, Detective Alexander spoke with Keith Wilson, who was incarcerated in Milan Federal Prison. The detective obtained a written statement, and based upon the statement, he spoke to Pace's father and stepmother and obtained a photograph of Pace. He then created a photo array, which he showed to Brown. Brown identified Pace as his assailant. An arrest warrant was issued on January 28, 2003. When Pace reported to his probation officer, he was detained.
 {¶ 10} After his arrest, Pace asked Detective Alexander what evidence they had against him. Detective Alexander told him that the police knew Brown was shot with a 9 millimeter gun, at which point, Pace laughed. Pace's response prompted Alexander to terminate the interview.
 {¶ 11} On January 30, 2003, Detective Alexander informed Pace he had been charged and would be going to court the following morning. As the detective turned to walk away, Pace asked him if he could talk with him. Thereafter, Pace provided a written statement confessing to shooting Brown.
 {¶ 12} Pace testified on his own behalf, and denied shooting Brown. According to Pace, the written statement he signed was a repetition of what Detective Alexander told him to say, and that the detective warned him that his bond would be high if he did not sign the statement. Detective Alexander also wanted him to implicate other people, including one Quinn Nettles, and wanted Pace to say that Nettles paid him to shoot Brown. Finally, Pace testified he has known Brown since he was a child and regularly saw him around the neighborhood.
 {¶ 13} The trial court found Pace guilty on all counts. The trial court merged the felonious assault charges with the charge of attempted murder. The firearm specifications were merged into a single three-year specification. The State dismissed the repeat violent offender specification and notice of prior conviction specification.
 {¶ 14} On July 7, 2004, the trial court sentenced Pace to a three-year term of incarceration for the firearm specification, followed by a nine-year sentence for the charge of attempted murder, and a concurrent eleven month sentence for the charge of having a weapon while under disability. Pace now appeals.
 JURY WAIVER {¶ 15} In the first assigned error, Pace argues the trial court was without jurisdiction to conduct a bench trial, because the written jury waiver was not executed in open court, and the trial court's journal entry memorializing the filing of the written waiver was not entered before the trial began. We disagree.
 {¶ 16} Crim.R. 23(A) provides that a criminal defendant may knowingly, intelligently, and voluntarily waive in writing his right to trial by jury.[1] The manner in which a defendant may effect such a waiver is governed by R.C. 2945.05, which provides, in relevant part:
"In all criminal cases pending in courts of record in this state, the defendant may waive a trial by jury and be tried by the court without a jury. Such waiver by a defendant shall be in writing, signed by the defendant, and filed in said cause and made a part of the record thereof. * * *
"Such waiver of trial by jury must be made in open court after the defendant has been arraigned and has opportunity to consult with counsel."
 {¶ 17} Thus, R.C. 2945.05 requires that a jury waiver be in writing, signed by the defendant and filed in the case and made a part of the record. Absent strict compliance with these requirements, a trial court lacks jurisdiction to try the defendant without a jury.[2]
 {¶ 18} Pace initially complains that the jury waiver was not signed in open court. Crim.R. 23(A) and R.C. 2945.05 are satisfied when, after arraignment and opportunity to consult with counsel, defendant signs a written statement affirming that he or she knowingly and voluntarily waives his or her constitutional right to a trial by jury and the court reaffirms this waiver in open court.[3]
 {¶ 19} It is not necessary that the waiver be signed in open court to be valid.[4] What the statute requires is that the trial court engage in a colloquy with the defendant such that the judge can make a reasonable determination that the defendant has been advised and is aware of the implications of voluntarily relinquishing a constitutional right.[5]
 {¶ 20} The record indicates that on June 8, 2004, the day before trial, the following exchange took place:
"The Court: You are here with Miss Snyder, your counsel. The State ofOhio is represented by Mr. Jones. I've been notified it's your desire towaive your jury trial and have a bench trial, is that right?
 The Defendant: Yes.
 The Court: Okay, well, if I could have the waivers or does he need tosign them?
 Ms. Snyder: No, they're signed.
 The Court: I have three documents here. Did you sign these documents,Mr. Pace.
 The Defendant: Yes.
 The Court: Did you read them before you signed them?
 The Defendant: Yes.
 The Court: Did you talk them over with Miss Snyder?
 The Defendant: Yes.
 The Court: Okay, I'll tell you why we did it, I had you sign three ofthem. We'll read what this says in any event. `I, Laron Pace, thedefendant in the cause, hereby voluntarily waive and relinquish my rightto a trial by jury and elect to be tried by a judge of the Court ofCommon Pleas. I understand I have a right under the constitutions andlaws of both the United States and the State of Ohio to a trial by a juryof twelve and no verdict can be made by a jury except by agreement of alltwelve members. I further state no threats or promises have been made toinduce me to waive this right and I'm not under the influence of anydrugs, alcohol or medication that would affect my decision.' Now is thatwhat you signed?
 The Defendant: Yes.
 The Court: Did you read that first?
 The Defendant: Yes.
 The Court: That's what you talked to Miss Snyder about?
 The Defendant: Yes.
 The Court: She has signed a certification that as your counsel she didexplain to you all of your rights under the constitution and laws of theUnited States and the State of Ohio to trial by jury, and she says thatno one threatened you or no promises were made to get you to sign thiswaiver when you really did not want to, is that right?
 The Defendant: Yes.
 The Court: Okay, any questions about the wisdom of doing this?
 The Defendant: No."[6]
 {¶ 21} Here, the record reflects that Pace's defense counsel presented the trial court with three signed jury waivers. The trial court asked Pace if he had signed those documents. After Pace acknowledged his signature, the trial court asked him whether he understood that he was entitled to a trial by jury and that by signing the forms, he was waiving that right. Upon Pace's affirmative responses, the trial court concluded that Pace had knowingly and intelligently waived his right to a jury trial. We find the above colloquy sufficient to satisfy the statute's open-court requirement.
 {¶ 22} Pace also asserts that the trial court lacked jurisdiction because the signed jury waivers were not filed prior to the commencement of trial. As this court has repeatedly made clear, however, strict compliance with R.C. 2945.05 is met upon filing the jury waiver; there is no rule pertaining to when the filing must occur.[7] Thus, as this court has previously stated, R.C. 2945.05 only requires that the waiver occur before trial and that the waiver is filed, time-stamped and contained in the record.[8] There is no requirement that the waiver be filed and placed in the record before trial.[9]
 {¶ 23} Here, the record reflects that Pace signed three jury waiver forms. The day before trial commenced, the trial court noted the following:
"I'm going to sign the first copy and date it with today's date and I'mgoing to mark it Court Exhibit A, and I'm going to give it to the courtreporter. The second copy I'm going to sign it and put today's date on itand I'm going to send it down to be journalized. The third copy I'm goingto take notification that it's a court order and send it down to bedocketed as if signed by counsel, understood?"[10]
 {¶ 24} In the absence of some showing to the contrary, there is a presumption that the trial court performed its duty.[11] Thus, we conclude that the trial court followed through with the filing and journalization of the jury waivers. Pace's argument that no written jury waiver had been filed prior to trial is without merit. Accordingly, we overrule Pace's first assigned error.
 MOTION TO SUPPRESS {¶ 25} In the second assigned error, Pace argues the trial court erred in denying his motion to suppress the written statement he made after his arrest. We disagree.
 {¶ 26} An appeal of a trial court's ruling on a motion to suppress evidence involves mixed questions of law and fact. Initially, we note that in a hearing on a motion to suppress evidence, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses.[12] Thus, the credibility of witnesses during a suppression hearing is a matter for the trial court. A reviewing court should not disturb the trial court's findings on the issue of credibility.[13] Accordingly, in our review we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence.[14]
 {¶ 27} In the instant case, Detective Alexander testified at the suppression hearing that on January 28, 2003, he read Pace his rights under Miranda v. Arizona,[15] and Pace acknowledged he understood them. At that time, Alexander advised Pace he was being arrested for the attempted murder of Brown. Pace inquired about the kind of evidence the police had against him. Alexander told him that Brown was shot with a 9 millimeter gun and that they had recovered .380 shell casings. Pace laughed, but refused to talk about the incident. Thereafter, Alexander terminated the interview.
 {¶ 28} Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. Here, Pace exercised his right to remain silent by refusing to make any statements about the incident. The police thus were required to immediately halt the interrogation.[16]
 {¶ 29} Indeed, Detective Alexander halted the custodial interrogation. After Pace exercised his right to remain silent, by refusing to discuss the incident, Detective Alexander did not initiate any further communication. However, further testimony at the suppression hearing reveals that two days later, on the night of January 30, 2003, Detective Alexander informed Pace he had been formally charged and would be going to court the following morning. At that time, Detective Alexander, again advised Pace of his rights, whereupon the following exchange took place:
"Q. What did he do after you told him that?
A. He kind of looked, he kind of looked towards the ground and said, `Detective, can I talk to you'?
Q. He said, `Detective, can I talk to you'?
A. Correct.
Q. What did you respond?
A. I said sure, but you know you have been charged, and again I advised him, I didn't repeat his rights but I advised him, you know, your rights and he said yeah"[17]
 {¶ 30} Statements obtained after a defendant invokes the right to remain silent are not per se inadmissible; their admissibility depends on whether the defendant's right to cut off questioning was scrupulously honored.[18] A suspect's rights are scrupulously honored when new and adequate warnings are given and there is a reasonable basis for inferring that the suspect has voluntarily waived his rights.[19]
 {¶ 31} The record indicates that on January 28, 2003, Pace was read his rights, acknowledged his rights, stated that he understood his rights, and exercised his rights by refusing to discuss the incident. Detective Alexander honored Pace's rights. However, two days later, Pace initiated further communication with Detective Alexander after being re-Mirandized. Re-Mirandizing a suspect is done to remind the suspect, during the subsequent interrogation, that he or she is under no obligation to speak.[20] Pace was advised of his rights on each encounter, but chose on January 30, 2003, to confess to shooting Brown. Thus, under the circumstances, it was reasonable for the trial court to find that Pace had knowingly, voluntarily, and intelligently waived his rights. Pace's subsequent confession was admissible. Accordingly, we overrule Pace's second assigned error.
 MANIFEST WEIGHT {¶ 32} In the third assigned error, Pace argues the guilty verdict is against the manifest weight of the evidence. We disagree.
 {¶ 33} When an appellant challenges a conviction on manifest weight grounds, we review the record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, "and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."[21] The discretionary power to grant a new trial should be exercised only in exceptional cases in which the evidence weighs heavily against the conviction.[22]
 {¶ 34} Stated succinctly, a reviewing court will not reverse a conviction where there is substantial evidence upon which the court could reasonably conclude that all elements of an offense have been proven beyond a reasonable doubt.[23]
 {¶ 35} This is not the exceptional case nor do we see any manifest miscarriage of justice. First, the victim, Brown, indicated that Pace was the individual who shot him. At the scene of the crime, Brown told police officers that an individual named Ron shot him, and almost a year later, while in federal prison, Brown positively identified Pace from a photographic array.
 {¶ 36} Second, Brown was very specific about how the shooting progressed. Brown testified he was shot first in his left leg, and as he turned to run, Pace shot him again in his left buttock, and as he continued to flee, Pace kept shooting, hitting him in the back and right leg.
 {¶ 37} Pace's written confession was almost identical to Brown's description. The following is excerpted from Pace's confession:
"Q. How many times did you shoot Chewy'?
I know the first time I shot him in his thigh and he stood there. I shot him again and he started running. I just started shooting after that. I don't know if I shot him again."[24]
 {¶ 38} Both Brown and Pace similarly described the shooting. Both stated that the first shot hit the leg, that Brown turned to run, and that Pace kept shooting.
 {¶ 39} Third, Pace's confession corroborated the physical evidence discovered at the scene. The police officers discovered.380 shell casings at the scene, which led them to believe a 9 millimeter gun was used. However, the following excerpt confirms Pace's involvement:
"Q. What type of gun did you use to shoot Chewy?
It was a MAC 11. It shot .380 rounds. It was black. That's why I was tripping because you all said I shot him with a 9 millimeter but I didn't."[25]
 {¶ 40} We also note, the above excerpt corroborates Pace's initial reaction of laughter or smirking when Detective Alexander told him authorities believed a 9 millimeter gun was used.
 {¶ 41} Finally, it is axiomatic that attempted murder is a specific intent crime which prohibits a person from purposely engaging in conduct which, if successful, would constitute the offense of murder.[26] In other words, the crime of attempted murder includes the element that a person acted with the specific intent to kill his victim.[27]
 {¶ 42} However, intent to commit an offense is not something easily proven by direct evidence. It must ordinarily be proven by reference to the surrounding facts and circumstances.[28] The element of purpose may be inferred where the natural and probable consequence of a defendant's act is to produce death.[29]
 {¶ 43} Here, the following excerpt from Pace's confession supports the specific intent requirement of attempted murder:
"Q. Laron, after being advised that you have been charged withattempted murder, is there anything you want to say?'
 I wasn't suppose to be down there. I got weekend pass from the halfwayhouse. I couldn't go to my mother's house because it was too late. I had to go stay over my cousin's house, Quanna. That night I was going to stay over her house.
I overheard Chewy talking with some dudes. I heard him say he was going to kick Quanna's door in and that if I was there, `fuck him if he do something, kill him.' I heard this in the parking lot by the plaza. When I heard it, it was dark outside. After I overheard it, I went back to the house. I thought about it for a minute and I got paranoid. I packed up my clothes and stuff. I saw him walk past the apartment through the window. That's when I got the gun out of the kitchen cabinet. I went outside and saw him go into the hallway. I confronted him, and I asked him what's up. He looked me up and down like I wasn't there so I shot him. I thought he was going to kill me so I did what I thought I had to do.
Were you trying to kill Chewy?
No, I knew Chewy. I couldn't kill him. I just wanted to scare him but when I asked him what's up, he looked at me like I was crazy."[30]
 {¶ 44} The State presented reliable credible evidence of Pace's guilt, and this court declines to substitute its own judgment concerning the credibility of the witnesses and the weight to be given to their testimony. We, therefore, cannot say that on the basis of the evidence the trial court "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."[31] Thus, the verdicts of guilty were not against the manifest weight of the evidence.[32] Accordingly, Pace's third assigned error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Dyke, J., and Kilbane, J., Concur.
[1] See, State v. Bays, 87 Ohio St.3d 15, 19, 1999-Ohio-216, citingState v. Ruppert (1978), 54 Ohio St.2d 263, 271.
[2] State v. Pless, 74 Ohio St.3d 333, 1996-Ohio-102, at paragraph one of the syllabus.
[3] State v. Ford (Mar. 14, 2002), Cuyahoga App. Nos. 79441 and 79442, 2002-Ohio-1100, citing State v. Walker (1993), 90 Ohio App.3d 352,358.
[4] Id.
[5] Id.
[6] Tr. at 62-64.
[7] State v. McKinney (Dec. 26, 2002), Cuyahoga App. No. 80991, 2002-Ohio-7249, citing State v. Sekera (Oct. 31, 2002), Cuyahoga App. No. 80690, 2002-Ohio-5972.
[8] State v. Antonic (Nov. 22, 2000), Cuyahoga App. No. 77678. See, also, State v. Pless, 74 Ohio St.3d 333, 1996-Ohio-102; State v. Gipson
(1998), 80 Ohio St.3d 626, 1998-Ohio-659.
[9] See State v. Jones (Feb. 5, 1999), 1st Dist. No. C-980270.
[10] Tr. at 65.
[11] City of Columbus v. Guthmann (1963), 175 Ohio St. 282. See, also,Boyd v. Edwards (1982), 4 Ohio App.3d 142, 150; State v. Coombs (1985),18 Ohio St.3d 123, 125.
[12] See State v. Robinson (1994), 98 Ohio App.3d 560; State v.Rossiter (1993), 88 Ohio App.3d 162; State v. Lewis (1992),78 Ohio App.3d 518; State v. Warren (Aug. 12, 1991), 4th Dist. No. 90CA7.
[13] See State v. Mills (1992), 62 Ohio St.3d 357; State v. Fanning
(1982), 1 Ohio St.3d 19.
[14] See State v. Harris (1994), 98 Ohio App.3d 543.
[15] (1966), 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602.
[16] Id. at 473-474.
[17] Tr. at 18.
[18] Michigan v. Mosley (1975), 423 U.S. 96, 104, 46 L.Ed.2d 313,96 S.Ct. 321; State v. Davie (1997), 80 Ohio St.3d 311, 320.
[19] State v. Wilkerson (Dec. 31, 1980), 10th Dist. No. 80AP-295, citing Hill v. Whealon (C.A.6, 1974), 490 F.2d 629, citing U.S. v.Collins (C.A.2, 1972), 462 F.2d 792. See, also, Williams v. Ohio (C.A.6, 1976), 547 F.2d 40.
[20] See, generally, Mosley, supra.
[21] State v. Martin (1983), 20 Ohio App.3d 172,175, citing Tibbs v.Florida (1982), 457 U.S. 31, 38, 42. See, also, State v. Thomkins
(1997), 78 Ohio St.3d 380.
[22] Martin, citing Tibbs. See, also, State v. Thomkins,78 Ohio St.3d 380, 1997-Ohio-52.
[23] State v. Eskridge (1988), 38 Ohio St.3d 56, paragraph two of the syllabus; State v. Eley (1978), 56 Ohio St.2d 169, syllabus.
[24] State Exhibit 1.
[25] State Exhibit 1.
[26] State v. Kidder (1987), 32 Ohio St.3d 279, State v. Fox (1981),68 Ohio St.2d 53, 55.
[27] State v. Karszewski (Nov. 4, 1994), 6th Dist. No. L-93-183.
[28] State v. Clark (1995), 101 Ohio App.3d 389, 405.
[29] State v. Robinson (1954), 161 Ohio St. 213.
[30] State Exhibit 1.
[31] State v. Martin, supra, at 175.
[32] State v. Jenks (1991), 61 Ohio St.3d 259.