The STATE of Ohio, Appellee,

v.

SANDERS, Appellant.

[Cite as State v. Sanders, 188 Ohio App.3d 452, 2010-Ohio-3433.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 09AP–983.

Decided July 22, 2010.

---

Ron O'Brien, Franklin County Prosecuting Attorney, and John H. Cousins IV, Assistant Prosecuting Attorney, for appellee.

Shaw & Miller and Mark J. Miller, for appellant.

---

BROWN, Judge.

{¶ 1} Matthew W. Sanders, defendant-appellant, appeals from a judgment of the Franklin County Court of Common Pleas, in which the court found him guilty, after a bench trial, of felonious assault, in violation of R.C. 2903.11, a felony of the second degree.

{¶ 2} On November 22, 2008, at approximately 9:30 p.m., appellant and his girlfriend, Jennifer Millar, were at a bar, McFadden's, in Columbus, Ohio. Millar ordered five drinks from the bartender, Adam Drzal, who was pouring two of the same kind of drinks for another customer. Drzal then proceeded to pour the five drinks for Millar. Millar then took all seven drinks and began distributing them to others. Drzal reached over the bar and either tapped or grabbed Millar's arm to inform her that she had not paid for any of the drinks. Millar was angry, and the two argued. Millar told appellant what had happened, and appellant and Drzal argued.

{¶ 3} Drzal signaled to a bouncer, Ethan Benning. Drzal, Benning, and another bouncer, Kyle Bailey, then began working their way through the crowd to ask Millar and appellant to leave the bar. According to the witnesses presented by the state of Ohio, plaintiff-appellee, as Drzal and Benning approached Millar and appellant, appellant sucker-punched Drzal in the face, knocking him unconscious. Appellant claims that Drzal pushed him in the back and only when he turned around and saw Drzal and the bouncers did he punch Drzal in self-defense. Benning testified that appellant, who was a mixed-martial-arts fighter licensed with the Ohio Athletic Commission, jumped on Drzal and began punching him in the face. Benning pulled appellant off Drzal and put him in a headlock. Appellant continued to punch Drzal, and appellant's friends began stomping their feet on Benning's face.

{¶ 4} The club's manager, Damian Fuller, then arrived on the scene. While Drzal and Benning went to the kitchen to clean their wounds, Fuller determined that appellant had been the one who had beaten Drzal because he had blood all over his clothes but had no injuries himself. Fuller escorted appellant from the bar. After returning to the kitchen and seeing Drzal's extensive injuries, including a broken nose, black eyes, a bone sticking out of his face, six or seven chipped teeth, and bruising on his chest and neck, Fuller contacted the police, who located appellant and arrested him.

{¶ 5} On May 7, 2009, appellant was indicted on one count of felonious assault. Prior to the start of trial on August 11, 2009, the trial court said to appellant in open court, "[I]t is my understanding that you have waived your right to a jury trial and would like to have the court decide this case," to which appellant replied, "[Y]es." The bench trial then proceeded.

{¶ 6} After the presentation of evidence, the trial court began deliberating. During deliberations, on August 19, 2009, the state e-mailed the trial court and appellant's counsel and requested a jury instruction on the theory of complicity.

{¶ 7} On August 20, 2009, the trial court found appellant guilty of felonious assault. On September 1, 2009, appellant filed a motion for new trial based upon the state's e-mail sent to the trial court during its deliberations. At the sentencing hearing on October 2, 2009, the trial court denied appellant's motion for new trial and sentenced appellant to a five-year term of community control. Appellant appeals the judgment of the trial court, asserting the following assignments of error:

[I]   The trial court lacked subject matter jurisdiction to try the Appellant, as the Appellant's waiver of a jury trial was not knowingly, intelligently and voluntarily made and the trial court failed to strictly comply with the requirements set forth in Ohio Revised Code Section 2945.05.

[II]   The trial court erred in denying the Appellant's motion for new trial, as the Appellant was deprived of his right to be present and to the presence and assistance of his counsel during a critical state of his trial, and his right to due process and a fundamentally fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 5, 10 and 16, Article I of the Ohio Constitution, as a result of the State submitting a new theory of prosecution in the form of jury instructions during the court's deliberations, when neither the Appellant or his counsel were present and were not given the opportunity to object or be heard.

[III]   The trial court erred in failing to find the appellant proved self-defense by a preponderance of the evidence and thus his conviction for felonious assault is against the manifest weight of the evidence.

{¶ 8} Appellant argues in his first assignment of error that the trial court lacked subject-matter jurisdiction to try him because his waiver of a jury trial was not knowingly, intelligently, and voluntarily made, and the trial court failed to strictly comply with the requirements set forth in R.C. 2945.05. The Sixth Amendment to the United States Constitution and Section 10, Article I, of the Ohio Constitution guarantee a criminal defendant the right to a jury trial. See *State ex rel. Columbus v. Boyland* (1979), 58 Ohio St.2d 490, 391 N.E.2d 324, fn. 1. Pursuant to Crim.R. 23(A), a criminal defendant may knowingly, voluntarily, and intelligently waive this constitutional right to a jury trial. *State v. Bays*

(1999), 87 Ohio St.3d 15, 19, 716 N.E.2d 1126, citing *State v. Ruppert* (1978), 54 Ohio St.2d 263, 271, 8 O.O.3d 232, 375 N.E.2d 1250.

{¶ 9} R.C. 2945.05 and Crim.R. 23(A) mandate that a jury waiver be made in writing and be signed by the defendant, and the requirements must appear of record for the trial court to have jurisdiction to try the defendant without a jury. See *State v. Riley* (1994), 98 Ohio App.3d 801, 649 N.E.2d 914. A written jury-trial waiver is required to ensure that the defendant's waiver is intelligent, knowing, and voluntary. See *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 52; *State v. Otte* (2002), 94 Ohio St.3d 167, 168, 761 N.E.2d 34.

{¶ 10} R.C. 2945.05 provides:

In all criminal cases pending in courts of record in this state, the defendant may waive a trial by jury and be tried by the court without a jury. Such waiver by a defendant, shall be in writing, signed by the defendant, and filed in said cause and made a part of the record thereof.  * * *

Such waiver of trial by jury must be made in open court after the defendant has been arraigned and has had opportunity to consult with counsel. Such waiver may be withdrawn by the defendant at any time before the commencement of the trial.

{¶ 11} The Supreme Court of Ohio has construed R.C. 2945.05 to require that five conditions be met in order for a waiver to be validly imposed. The waiver must be (1) in writing, (2) signed by the defendant, (3) filed, (4) made part of the record, and (5) made in open court. See *State v. Lomax*, 114 Ohio St.3d 350, 2007-Ohio-4277, 872 N.E.2d 279, ¶ 9. Trial courts must strictly comply with the requirements of R.C. 2945.05. *State v. Pless* (1996), 74 Ohio St.3d 333, 337, 339, 658 N.E.2d 766; *State ex rel. Jackson v. Dallman* (1994), 70 Ohio St.3d 261, 262, 638 N.E.2d 563. "In the absence of strict compliance with R.C. 2945.05, a trial court lacks jurisdiction to try the defendant without a jury." *Pless* at 337, 658 N.E.2d 766.

{¶ 12} In the present case, appellant argues that his jury waiver did not satisfy the "open court" requirement set forth in R.C. 2945.05. Appellant contends that the trial court completely failed to determine whether the waiver was knowingly, intelligently, and voluntarily made. Appellant relies upon *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464, and *Bays*, for the proposition that the open-court requirement is satisfied only after the trial court specifically inquires whether the defendant voluntarily signed a jury-trial waiver, including questions whether the defendant's signature appeared on the waiver, whether the defendant signed the waiver of his own free will, and whether anyone forced him to sign the waiver.

■ {¶ 13} Here, prior to the start of trial, the trial court stated to appellant in open court, "[I]t is my understanding that you have waived your right to a jury trial and would like to have the court decide this case," to which appellant replied, "[Y]es." The bench trial then proceeded. We find that this satisfied the minimum requirements of R.C. 2945.05 and *Lomax*. The court in *Lomax* specifically held that "a trial court does not need to engage in an extended colloquy with the defendant in order to comply with the statutory requirement that a jury waiver be made in open court." 114 Ohio St.3d 350, 2007-Ohio-4277, 872 N.E.2d 279, at ¶ 42. The court further instructed that R.C. 2945.05 does "not mandate magic words, or a prolonged colloquy." Id. at ¶ 48. Rather, there must only be "some evidence in the record of the proceedings that the defendant acknowledged the waiver to the trial court while in the presence of counsel, if any." Id. at ¶ 42. In interpreting the term "acknowledge," as used in *Lomax*, one court has found that it means " '[t]o own, avow, or admit; to confess; to recognize one's acts, and assume the responsibility therefor.' " *State v. Burnside*, 186 Ohio App.3d 733, 2010-Ohio-1235, 930 N.E.2d 372, ¶ 64, quoting Black's Law Dictionary (6th Ed.Rev.1990). A defendant need not have a complete or technical understanding of the jury-trial right in order to knowingly and intelligently waive it. *Lomax* at ¶ 40, citing *Bays*, 87 Ohio St.3d at 20, 716 N.E.2d 1126.

{¶ 14} Here, appellant clearly acknowledged that he had waived his right to a jury trial by responding "yes" to the trial court's question. Contrary to appellant's arguments, the trial court was not required to engage in further questioning about appellant's understanding of his rights or to inform appellant of his jury-trial rights. *Lomax* requires only that appellant acknowledge the waiver in open court, and appellant did so here. The present circumstances are not like those in *Lomax*, in which the only reference to a jury waiver was " 'Since there's going to be a jury waiver, does the State care to make an opening statement at this time?' " to which the defendant's counsel responded, " 'Briefly.' " *Lomax* at ¶ 46. Here, the trial court addressed appellant directly and appellant himself responded affirmatively that he was waiving a jury trial. Also, unlike in *Lomax*, the trial court here used the past tense "waived," indicating that a waiver had already occurred as of the commencement of trial. See id. at ¶ 47.

■ {¶ 15} *Jells* and *Bays* require no more of the trial court than what occurred here. Although the trial court in both cases engaged in a more in-depth colloquy with the defendant than what occurred here, neither case held that such an in-depth colloquy was required. We echo the statement made by the court in *Jells* that "[w]hile it may be better practice for the trial judge to enumerate all the possible implications of a waiver of a jury, there is no error in failing to do so." *Jells*, 53 Ohio St.3d at 26, 559 N.E.2d 464. For these reasons, we find that

appellant properly acknowledged his jury-trial waiver in open court consistent with the mandates of *Lomax* and R.C. 2945.05.

{¶ 16} Appellant also argues that because the waiver was filed eight days after the verdict, it should be viewed with "great suspicion." However, appellant cites no authority for the proposition that a written waiver must be filed before a jury trial commences. Neither *Lomax* nor R.C. 2945.05 makes any mention of such a requirement. *Lomax* and R.C. 2945.05 both require only that the waiver be filed and made a part of the record. Other courts have addressed this issue and have likewise concluded that R.C. 2945.05 "contains no requirement that to be valid a jury waiver be filed prior to the commencement of the trial." See *State v. Johnson*, 1st Dist. No. C–0801195, 2009-Ohio-6800, 2009 WL 4985253, ¶ 79 (written jury waivers were valid even though they were executed and filed after the commencement of the trial); see also *State v. Soto*, 8th Dist. No. 86390, 2006-Ohio-2319, 2006 WL 1281009, ¶ 33–41; *State v. Pace*, 8th Dist. No. 84996, 2005-Ohio-3586, 2005 WL 1653588, ¶ 22 (there is no requirement that the waiver be filed and placed in the record before trial). Here, appellant's written waiver was filed and made part of the record, and we find that was sufficient to comply with R.C. 2945.05 and *Lomax*. For these reasons, appellant's first assignment of error is overruled.

{¶ 17} Appellant argues in his second assignment of error that the trial court erred in denying his motion for new trial when (1) he was deprived of his right to be present and to the presence and assistance of his counsel during a critical state of his trial and (2) he was denied his right to due process, as a result of the state submitting a new theory of prosecution in the form of jury instructions during the court's deliberations, when neither appellant nor his counsel were present and were not given the opportunity to object or be heard.

{¶ 18} Appellant based his motion for new trial on Crim.R. 33(A)(1), which allows for a new trial when there is an irregularity in the proceedings. A reviewing court will not disturb a trial court's decision granting or denying a Crim.R. 33 motion for new trial absent an abuse of discretion. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 82, citing *State v. Schiebel* (1990), 55 Ohio St.3d 71, 76, 564 N.E.2d 54. An abuse of discretion exists when the record demonstrates that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Clark* (1994), 71 Ohio St.3d 466, 470, 644 N.E.2d 331. A new trial should not be granted unless it affirmatively appears from the record that a defendant was prejudiced by one of the grounds stated in the rule or was thereby prevented from having a fair trial. *State v. Samatar*, 152 Ohio App.3d 311, 2003-Ohio-1639, 787 N.E.2d 691, ¶ 35.

{¶ 19} In the present case, appellant argues that there was an irregularity in the proceedings when after the presentation of evidence and during the trial court's deliberations, the state e-mailed the trial court and appellant's counsel and requested a jury instruction on the theory of complicity, along with supporting case law. Appellant claims this communication was an improper ex parte communication that violated his right to due process. We first note that whether the e-mail communication should be considered ex parte is unclear. When a party complains that his due-process rights were violated due to the other party's communication with the trial court, the complaining party must first produce some evidence that the communication was actually ex parte. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 236–37, 15 OBR 311, 473 N.E.2d 264. An ex parte communication has been defined by some courts as an act done without notice to an adversely interested party. See *Keller v. Keller*, 4th Dist. No. 02CA19, 2003-Ohio-6462, 2003 WL 22860832, ¶ 27, fn. 3, citing Black's Law Dictionary (5th Ed.1979); *State v. Boddie* (Sept. 6, 2001), 3d Dist. No. 1–2000–72, 2001 WL 1023107, citing Black's Law Dictionary (6th Ed.1990) (an action is ex parte when it is taken or granted at the instance and for the benefit of one party only, and without notice to, or contestation by, any person adversely interested); *Metzger v. Thurman* (July 27, 1993), 4th Dist. No. 92 CA 2106, 1993 WL 278495, fn. 5, citing *D'Acquisto v. Washington* (N.D.Ill.1986), 640 F.Supp. 594, 621 (an ex parte communication is a communication about a case that an adversary makes to the decision maker without notice to an affected party). Here, the prosecutor sent a contemporaneous copy of the e-mail it sent to the court to appellant's counsel as well. Thus, appellant had notice of the communication. Accordingly, pursuant to the definitions used in cases like *Keller*, *Boddie*, and *Metzger*, the e-mail sent by the prosecutor to the trial court would not be considered ex parte. See *Keller* at ¶ 27, fn. 3 (letter sent from counsel to magistrate was not an ex parte communication because counsel gave notice to the other party by forwarding a copy to the other party's counsel).

{¶ 20} However, it has also been held that letters from interested parties attempting to persuade the judge to their viewpoint or to bring some information to the judge's attention constitute improper ex parte communications. See *State ex rel. Beacon Journal Publishing Co. v. Whitmore* (1998), 83 Ohio St.3d 61, 63, 697 N.E.2d 640. In *In re Pierce*, 4th Dist. No. 07CA4, 2008-Ohio-1956, 2008 WL 1837258, ¶ 12, the court found that a letter to the trial court from a party with the purpose to influence the court's decision was ex parte, despite the fact that the trial court immediately sent a copy of the letter to both parties' attorneys. Under this definition, the prosecutor's e-mail in the present case may have constituted an ex parte communication, even though the prosecutor also sent the e-mail to appellant's counsel.

{¶ 21} Nevertheless, even if an ex parte communication occurs, the complaining party must still show some prejudicial impact from the ex parte communication. See *State v. Lyons*, 11th Dist. No. 2001–A–0056, 2003-Ohio-3494, 2003 WL 21508401, ¶ 28, reversed on other grounds in *State v. Lyons*, 101 Ohio St.3d 94, 801 N.E.2d 458, 2004-Ohio-27 (even if prosecutor's letter to judge was ex parte, the defendant failed to show that any prejudice occurred as a result of the letter); *State v. Hall* (Mar. 3, 1999), 9th Dist. No. 2770–M, 1999 WL 157427, citing *Smith v. Flesher* (1967), 12 Ohio St.2d 107, 41 O.O.2d 412, 233 N.E.2d 137, paragraph one of the syllabus (it is fundamental that to demonstrate reversible error on appeal, one must show not only that an error was committed but also that the error resulted in prejudice); see also *Tabbaa v. Koglman*, 8th Dist. No. 84539, 2005-Ohio-1498, 2005 WL 730098, ¶ 43 (although one party improperly submitted supplementary exhibits to the court via a letter, there was no prejudice caused by the letter); *Hampton–Jones v. Jones* (2001), 8th Dist. No. 77279 (even if the ex parte contact occurred, no prejudice can be shown); *State v. Mira* (July 24, 1998), 6th Dist. No. H–97–032, 1998 WL 422278 (appellant did not show any prejudice from the alleged ex parte communications between the trial judge and her former landlord).

{¶ 22} In the present case, there is no evidence in the record that the trial court relied upon anything in the e-mail in reaching its determination, and the record is unclear whether the trial court even read the e-mail. The only portion of the record that sheds any light upon the trial court's response to the e-mail was during the sentencing hearing, at which the trial court stated it had received the e-mail but did not have any case law attached. The trial court did not indicate that it had read the e-mail and did not indicate that it considered anything in the e-mail. Furthermore, as discussed above, the prosecutor sent a contemporaneous copy of the e-mail to appellant's counsel as well; thus, appellant had notice of the e-mail. Other courts have refused to find any prejudicial impact from ex parte letters sent to the trial court under similar circumstances. See, e.g., *In re Swader* (Feb. 5, 2001), 12th Dist. No. CA2000–04–036, 2001 WL 121084 (trial court acted appropriately when receiving a letter from one party because the court forwarded copies of the letter to the parties' counsel immediately upon receiving it, and there was no evidence in the record to suggest that the trial court relied upon the letter); *Tabbaa* at ¶ 43 (although one party mailed a letter to the court as a means of supplementing the exhibits offered at an evidentiary hearing, there was no prejudice caused by the letter because the opposing party was sent a copy of the letter). Furthermore, as we will discuss, we find that there was competent, credible evidence in the record otherwise supporting the trial court's decision. See *Tabbaa* at ¶ 43 (no prejudice from one party's communication with court when there was otherwise ample competent, credible evidence in the record supporting the trial court's decision).

{¶ 23} In addition, many Ohio courts of appeals have held that, as a general principle, supplemental instructions to a jury after deliberations have begun are not per se prejudicial. See *State v. Spence,* 10th Dist. No. 05AP–891, 2006-Ohio-6257, 2006 WL 3438668, ¶ 98, citing *State v. Hicks* (Mar. 26, 1990), 2d Dist. No. 11567; *State v. Hairston* (1977), 60 Ohio App.2d 220, 225, 14 O.O.3d 191, 396 N.E.2d 773; *State v. McGrath* (Nov. 19, 1985), 4th Dist. No. 1218, 1985 WL 17457; *State v. Fannin* (Oct. 9, 1987), 6th Dist. No. OT–87–9, 1987 WL 18135; *State v. Taylor* (Aug. 5, 1976), 8th Dist. No. 35109, 1976 WL 191075; *State v. Golden Charities, Inc.* (May 24, 1978), 9th Dist. No. 8639, 1978 WL 215202; *State v. Morgan* (Sept. 30, 1991), 11th Dist. No. 90–A–1554; *State v. Moorehead* (May 9, 1996), 10th Dist. No. 95APA09–1116, 1996 WL 239643. "'If from the entire charge it appears that a correct statement of the law was given in such a manner that the jury could not have been misled, no prejudicial error results.'" *Spence* at ¶ 99, quoting *State v. Hardy* (1971), 28 Ohio St.2d 89, 92, 57 O.O.2d 284, 276 N.E.2d 247. In the present case, the jury instructions submitted by the prosecutor were a complete and correct instruction on complicity, and the submission was done in such a manner that the court could not have been misled. Furthermore, despite appellant's argument that complicity was a new theory raised for the first time in the e-mail, the state discussed the complicity theory in its trial brief, closing argument, and rebuttal to closing argument. Therefore, although we do not condone such communications when they are not currently provided for in any rules of court, we find that appellant suffered no prejudice by the prosecutor's e-mail. Accordingly, appellant's second assignment of error is overruled.

{¶ 24} Appellant argues in his third assignment of error that the trial court erred in failing to find that he proved self-defense by a preponderance of the evidence; thus, his conviction for felonious assault is against the manifest weight of the evidence. The criminal manifest-weight-of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. Under the manifest-weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive—the state's or the defendant's? Id. at ¶ 25. Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387, 678 N.E.2d 541; *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148 (although there is sufficient evidence to sustain a guilty verdict, a court of appeals has the authority to determine that such a verdict is against the weight of the evidence); *State v. Johnson* (2000), 88 Ohio St.3d 95, 723 N.E.2d 1054.

{¶ 25} When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "13th juror" and disagrees with the fact-finder's resolution of the conflicting testimony. *Wilson* at ¶ 25, quoting *Thompkins* at 387, 678 N.E.2d 541. In determining whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving any conflicts in the evidence, the jury clearly lost its way and thereby created such a manifest miscarriage of justice that the conviction must be reversed and a new trial must be ordered. *Thompkins* at 387, 678 N.E.2d 541, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 26} A conviction should be reversed on manifest-weight grounds only in the most exceptional case in which the evidence weighs heavily against the conviction. *Thompkins* at 387, 678 N.E.2d 541, citing *Martin* at 175, 20 OBR 215, 485 N.E.2d 717. Moreover, it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible. *State v. Brown*, 10th Dist. No. 02AP–11, 2002-Ohio-5345, 2002 WL 31194302, ¶ 10, citing *State v. Long* (Feb. 6, 1997), 10th Dist. No. 96APA04–511, 1997 WL 52911.

{¶ 27} The elements of the crime and the existence of self-defense are separate issues. Self-defense seeks to relieve the defendant from culpability rather than to negate an element of the offense charged. *State v. Martin* (1986), 21 Ohio St.3d 91, 94, 21 OBR 386, 488 N.E.2d 166. In his third assignment of error, appellant argues that the guilty verdict upon which his conviction is based was against the manifest weight of the evidence at trial on the issue of self-defense alone.

{¶ 28} Self-defense is an affirmative defense that must be proven by a preponderance of the evidence. *State v. Jackson* (1986), 22 Ohio St.3d 281, 282, 22 OBR 452, 490 N.E.2d 893. In order to prevail on his defense of self-defense, appellant had to show that (1) he was not at fault in giving rise to the affray, (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from danger was the use of such force, and (3) he did not violate any duty to retreat or avoid the danger. Id. See also *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755, paragraph two of the syllabus.

{¶ 29} Here, appellant claims that he punched Drzal in self-defense. Appellant asserts that the evidence demonstrated that he was not at fault in creating the situation giving rise to his throwing one punch at Drzal. Appellant argues that

several witnesses testified that Drzal was intoxicated, became angry with appellant and his girlfriend, proceeded around the bar with two bouncers, and then pushed appellant. Appellant claims that he had reasonable grounds to believe that he was in immediate danger of bodily harm because Drzal was angry, shouted obscenities at Millar, told appellant he was going to "kick his ass," approached appellant flanked by two bouncers, and then pushed appellant.

{¶ 30} The testimony at trial was as follows. Drzal testified that appellant and Millar were being very insistent about receiving their drinks. He said Millar took seven drinks he had poured, when she had only ordered five, and she had not yet paid for them, so he reached over the bar and tapped her on the elbow. He denied grabbing her. She was uncooperative, intoxicated, and argumentative, stating, "[W]e fucking ordered these shots. We are going to pay for them. You don't need to tell me what to do." Appellant then began arguing with Drzal, using the "F-word." Drzal told appellant to calm down or he would have to leave. Appellant continued yelling at Drzal so Drzal retrieved two bouncers, Kyle Bailey and Ethan Benning. He walked through the crowd with Benning behind him to locate appellant. When Drzal turned around, appellant punched him in the face. Drzal denied that he ever "stared down" appellant or threatened to "kick his ass." Drzal said that he last consumed one or two beers around noon, prior to starting work at 3:00 p.m., and the incident happened around 9:30 p.m.

{¶ 31} Ethan Benning, one of the bouncers, testified that Drzal came to him and said they needed to kick someone out of the bar because they were being "assholes." Benning was walking behind Drzal toward appellant when appellant sucker-punched Drzal in the face. Drzal had not shoved or touched appellant prior to the punch, and Drzal did not act in a threatening manner. Drzal did not walk toward appellant like he was going to fight him and was not preparing for a fight. Benning stated that as soon as Drzal fell to the floor, appellant got on top of Drzal and started punching him in an Ultimate–Fighting–Championship style of fighting and looked like a highly trained fighter, putting his full body into the punches. Benning called appellant "drunk" and "furious."

{¶ 32} Allison Clayman, Drzal's sister, testified that she met Drzal at the hospital at about 11:00 p.m. the night of the incident. She did not think Drzal had been drinking, and he was not drunk.

{¶ 33} Kyle Bailey, who was a bouncer during the incident, testified that Drzal told him that there was a problem with one of the customers and asked Bailey to follow him. He and Drzal walked through the crowd, with a few patrons between them, and Bailey saw a punch being thrown. He did not see who threw the punch. Bailey thought that Benning then took appellant to the ground, but he said he was not certain if appellant was standing at the time Benning took him to the ground. He said he only remembers that they ended up on the ground.

Bailey also stated there were other people throwing punches. Bailey later testified that on the police statement he made the day after the event, he wrote that several punches had been thrown at Drzal, and his memory was fresher when he completed the police statement. He also testified that although he swung and struck others' hands to try to break up the fight, he never struck Drzal.

{¶ 34} Jennifer Millar, appellant's girlfriend for three years, testified that appellant went to the bathroom while she ordered drinks. He was never with her during the time she was ordering drinks and never demanded service from the bartender. She testified that appellant never even talked to the bartender. She said her friend Bill O'Brien tried to order shots from Drzal, but Drzal was pacing, as if frustrated. She thought she would try to help O'Brien order, but she was having a hard time because it was so crowded. She was holding money or a credit card to get Drzal's attention, but he was ignoring her. Once O'Brien was able to order from Drzal, she reached for a shot glass, and Drzal grabbed her arm, causing her to spill the drink. Drzal then said, "[W]ho the hell is this bitch?" She stepped away without saying anything. At this time, appellant had returned from the bathroom. When she told appellant what happened, Drzal shouted "[W]hat are you staring at?" and "[W]hat's your problem?" Millar said she approached Drzal and asked what was going on, but Drzal was furious and kept yelling at appellant. She thought Drzal was intoxicated. Appellant was silent during this time and said nothing to Drzal. Millar saw Drzal walk around the bar and come toward them with two bouncers following him. Drzal approached appellant from behind. Millar did not see what happened next but then saw appellant and Drzal on the ground and bouncers falling on them. Somehow she got hit, chipping her tooth and cracking her molar.

{¶ 35} Brandon O'Neill, appellant's friend who was at the bar with him, testified that he was drunk by the time they arrived at the bar. He had been drinking for about 11 hours by that time. He said appellant was not standing with them at the bar when Joe Shoecraft ordered shots. Drzal poured one too many shots, and O'Brien told Drzal to keep one for himself. He asked Drzal whether they are allowed to drink on the job, and Drzal responded, "I've been drinking all day. This is my last day on the job, fuck this place." O'Neill said he believed Drzal had been drinking. Millar then took a shot from the bar. Drzal smacked and grabbed her hand and said, "[W]hat is this whore doing[?]" and then went on a "rampage" calling her names. Appellant arrived on the scene around this time, and Millar told him what happened. Appellant was looking at Drzal, and Drzal asked appellant if there was a problem. Appellant shook his head no. Drzal said he was going to come around the bar and "beat [his] ass." One to two minutes later, Drzal approached appellant from behind and looked

like he was going to throw a punch or push appellant. Appellant then turned around and punched Drzal.

{¶ 36} O'Brien, appellant's friend who was also at the bar, testified that he ordered beers and shots while appellant was in the bathroom. When he was ordering, Drzal told him to "hurry the fuck up." Drzal poured an extra shot, and O'Brien told Drzal he could drink it himself. O'Brien thought Drzal was intoxicated. Millar then reached over and tried to take a shot, and Drzal hit her hand and said, "[W]hat the fuck are you doing[?]" Appellant then returned, and O'Brien saw Drzal speaking to appellant. He saw Drzal then walk around the bar, and he did not see him again until after the fight started.

{¶ 37} Joseph Shoecraft, appellant's friend who was also at the bar, testified that he had ten drinks the day of the incident. He said Millar ordered shots but then accidentally knocked one over. Drzal then grabbed Millar's arm and yelled at her. Shoecraft testified that he believed Drzal was drunk. At this point, appellant returned from the bathroom, and Millar went to appellant to tell him what happened. Drzal then said he was going to kick appellant's "ass." Drzal walked around the bar and toward appellant with other employees behind him. Appellant then punched Drzal. Shoecraft said they had no problem getting Drzal to serve them.

{¶ 38} Appellant testified that he was not intoxicated at the bar and had consumed about eight beers since 2:00 p.m. When they arrived at the bar, he went to the bathroom. He was never at the bar while Millar was allegedly demanding service, and he never ordered any drinks. Appellant also testified that he never had any conversation with Drzal. As he was returning from the bathroom, Millar told him that she wanted to leave because she had spilled a shot and Drzal had grabbed her arm. Drzal then started yelling at him, "[W]hat the fuck are you looking at, pussy[?]" Appellant did not respond to Drzal. Millar then turned around and tried to apologize to Drzal. Drzal ignored her and told appellant he was going to come over and "kick his ass." Drzal walked to the end of the bar, and then appellant turned around to talk to Millar. Someone shoved him in the back, and when he turned around, Drzal was behind him with two large bouncers. He believed he was in danger, so he punched Drzal one time. A bouncer punched him in the eye and then put him in a chokehold, pulling him to the ground. He said he only punched Drzal one time.

{¶ 39} Christopher Wascak, a college friend of Millar's, testified that he was in class and Millar told him not to go to McFadden's bar because her boyfriend got in a fight there. She described her boyfriend as a "cage fighter." She was laughing about the incident.

{¶ 40} In addressing a manifest-weight-of-the-evidence argument, we are able to consider the credibility of the witnesses. See *Martin*, 20 Ohio App.3d at 175, 20 OBR 215, 485 N.E.2d 717. However, in conducting our review, we are guided by the presumption that the jury, or the trial court in a bench trial, "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273. Thus, a reviewing court must defer to the factual findings of the jury or judge in a bench trial regarding the credibility of the witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. Concerning the issue of assessing witness credibility, the general rule of law is that "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan* (1986), 22 Ohio St.3d 120, 123, 22 OBR 199, 489 N.E.2d 277. Indeed, the fact-finder is free to believe all, part, or none of the testimony of each witness appearing before it. *Hill v. Briggs* (1996), 111 Ohio App.3d 405, 412, 676 N.E.2d 547. If evidence is susceptible to more than one construction, reviewing courts must give it the interpretation that is consistent with the verdict and judgment. *White v. Euclid Square Mall* (1995), 107 Ohio App.3d 536, 539, 669 N.E.2d 82. Mere disagreement over the credibility of witnesses is not sufficient reason to reverse a judgment. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24.

{¶ 41} Appellant's self-defense claim in the present case turns solely on witness credibility. Appellant is correct that several of his witnesses testified that Drzal was intoxicated, told appellant he was going to "kick his ass," and later pushed appellant while in the presence of two bouncers. However, the state presented several witnesses that presented testimony that conflicted with that of appellant's witnesses. The state's witnesses testified that Drzal was not intoxicated, appellant and Millar were being combative, Drzal did not push appellant before appellant sucker-punched Drzal, and appellant jumped onto Drzal and continued to punch him. The trial court, as the finder of fact, apparently believed the state's witnesses and did not believe appellant's witnesses. Appellant has given this court no reason why we should not believe the state's witnesses or why the trial court's credibility determination should be questioned. Given the evidence presented, the trial court could have easily concluded that appellant was at fault in giving rise to the affray, and appellant had other means of escape without the use of force. The present circumstances do not rise to the level required to reverse a decision as being against the manifest weight of the evidence, and this was not an exceptional case in which the trial court lost its way and created such

a manifest miscarriage of justice that the conviction must be reversed. Therefore, we must overrule appellant's third assignment of error.

{¶ 42} Accordingly, appellant's three assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

Judgment affirmed.

BRYANT and MCGRATH, JJ., concur.