[Cite as *State v. Liskany*, 196 Ohio App.3d 609, 2011-Ohio-4456.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE COUNTY**

THE STATE OF OHIO,

        Appellee,

v.

LISKANY,

        Appellant.

    :   Appellate Case No. 2010-CA-53
    :
    :   Trial Court Case No. 2008-CR-768
    :
      (Criminal Appeal from
      Common Pleas Court)
    :

. . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of September, 2011.

. . . . . . . . . .

Stephen K. Haller, Greene County Prosecuting Attorney, and Stephanie R. Hayden, for appellee.

Rion, Rion & Rion, L.P.A., Inc., and Jon Paul Rion, for appellant.

FAIN, Judge.

{¶ 1} Defendant-appellant, David Liskany, appeals from an order of the Greene County Court of Common Pleas denying his Crim. R. 32.1 motion to withdraw a guilty plea. Liskany contends that the trial court abused its discretion in denying the motion because he presented sufficient evidence to demonstrate that trial counsel was ineffective and made misrepresentations that induced him to enter a plea of guilty. He further contends that there is evidence demonstrating that the trial court was under the

impression that the state had agreed to recommend a sentence of not less than four years, when in actuality the agreement called for a recommendation of a sentence of not more than four years. Finally, he contends that the state reneged on its plea agreement when its agent, sheriff's deputy Eric Spicer, submitted a letter to the trial court seeking a punishment of "the longest possible period."

{¶ 2} We conclude that the trial court did not abuse its discretion in determining that Liskany's counsel did not make any misrepresentation regarding sentence or in determining that counsel's performance was not deficient so as to have deprived Liskany of the effective assistance of counsel. We further conclude that the record does not support Liskany's claim that the trial court was operating under a mistaken belief regarding the terms of the plea agreement. But we do conclude that the Spicer letter constituted a breach of the state's promise to recommend a sentence of not more than four years.

{¶ 3} Accordingly, the sentence of the trial court is reversed, and this cause is remanded for new sentencing in accordance with this opinion.

I

{¶ 4} In 2007, Jamestown Sheriff's Department detectives interviewed a minor, J.L., with regard to "charges of runaway." According to the allegations in the record, the child had left his home in Jamestown and had taken three days to walk to his aunt's house in Lebanon in order to escape the abusive practices of his father, David Liskany. Liskany had been using a dog shock collar on J.L. and his younger brother, T.L., as a means of discipline. Liskany would hold the boys down and use a hose to spray into their faces so that they could not breathe. Liskany would sometimes hold the boys under water in the

pool until they ran out of breath. Liskany also would throw his four-year-old daughter, S.L., into the deep end of the pool when she soiled her pants. He also made all three kids take showers in extremely cold water and would throw more cold water on them while they showered.

{¶ 5} Liskany was indicted on ten counts of endangering children. He retained the office of attorney Patrick Mulligan to represent him with regard to the charges. Mulligan's associate, Nick O'Bryan, was also involved in Liskany's representation. Defense counsel and the prosecutor reached an agreement wherein Liskany would plead guilty to two counts of felonious assault and one count of attempted felonious assault, in exchange for which the prosecutor would drop all the endangering-children charges and recommend a prison sentence of not more than four years.

{¶ 6} At the plea hearing the following exchange took place:

{¶ 7} "THE COURT: And the Court has also had presented to it in this case a Petition to Enter a Plea of guilty which you've apparently signed and initialed the pages, is that correct, Mr. Liskany?

{¶ 8} "A: Yes, your Honor.

{¶ 9} "THE COURT: Is it your desire to enter a plea of guilty here this afternoon?

{¶ 10} "A: Yes, your Honor.

{¶ 11} "THE COURT: Is that your signature attached to the Petition and your initials on the pages:

{¶ 12} "A: Yes, your Honor.

{¶ 13} "THE COURT: By signing that Petition, you're telling me that you have read it, you understand it, you agree with it, and you have discussed it thoroughly with

your counsel, Mr. Mulligan, is that correct?

**{¶ 14}** "A:   Yes.

**{¶ 15}** "    * * *

**{¶ 16}** "THE COURT:   You're represented by Attorney, L. Patrick Mulligan?

**{¶ 17}** "A:   Yes, your Honor.

**{¶ 18}** "THE COURT:   Are you totally satisfied with Mr. Mulligan's services?

**{¶ 19}** "A:   Yes, your Honor.

**{¶ 20}** "THE COURT:   Has he advised you as to your Constitutional Rights?

**{¶ 21}** "A:   Yes, your Honor.

**{¶ 22}** "THE COURT:   Has he answered all the questions that you might have regarding the three counts contained in the Bill of Information?

**{¶ 23}** "A:   Yes, your Honor.

**{¶ 24}** "THE COURT:   Have you discussed the plea of guilty with Mr. Mulligan and your rights pursuant to this plea?

**{¶ 25}** "A:   Yes, your Honor.

**{¶ 26}** "THE COURT:   And are you totally satisfied with his advice to you and his representation of you with reference to this plea?

**{¶ 27}** "A:   Yes, your Honor."

**{¶ 28}** The court then advised Liskany of his constitutional rights, and Liskany indicated that he understood those rights.   Thereafter, the plea colloquy continued as follows:

**{¶ 29}** "THE COURT:   And understanding [those rights], do you still wish to go forward with your plea?

{¶ 30} "A:   Yes, your Honor.

{¶ 31} "THE COURT:   You're entering this plea voluntarily?

{¶ 32} "A:   Yes, your Honor.

{¶ 33} "THE COURT:   Has Mr. Mulligan, or anyone connected with the prosecutor's office, or anybody connected with the Court forced you in any way to do this?

{¶ 34} "A:   No, your Honor.

{¶ 35} " * * *

{¶ 36} "THE COURT:   Now, it's my understanding you and your counsel have negotiated a plea agreement with the State of Ohio.   That agreement is that the Defendant shall tender pleas of guilty to the three counts contained in the Bill of Information, charging two counts of felonious assault, felonies of the second degree, and one count of attempted felonious assault, felony of the third degree.   The State shall dismiss the indictment in Case Number 2007-CR-0860.   At the time of sentencing, the State will recommend a sentence of not more than four years.   Is that your understanding of the agreement you and your counsel have negotiated with the State?

{¶ 37} "A:   Yes, your Honor.

{¶ 38} "THE COURT:   Do you acknowledge and consent to that agreement?

{¶ 39} "A:   Yes, your Honor.

{¶ 40} "THE COURT:   Have there been any other agreements or promises made to you other than that agreement?

{¶ 41} "A:   No, your Honor.

{¶ 42} "THE COURT:   Do you understand that agreement is between you and the State of Ohio, it does not necessarily bind the Court to go along with that agreement.

The Court can go along with it, but is not required to go along with it.

{¶ 43} "MR. MULLIGAN:   Excuse me your Honor, can we approach on that issue?

{¶ 44} "WHEREUPON, discussion ensued at the bench as follows:

{¶ 45} "MR. MULLIGAN:   It's actually a situation where the agreement is that the maximum the Court could sentence him to is four years.

{¶ 46} "THE COURT:   I'm not going to agree to that maximum.   I mean, that is a recommendation.

{¶ 47} "MR. GALL:   That is my recommendation.

{¶ 48} "THE COURT:   That is the recommendation but that does not bind me.

{¶ 49} "MR. MULLIGAN:   Well, that was not our understanding, your Honor.

{¶ 50} "MR. GALL:   I can't commit for the Judge.   You know that, Pat.

{¶ 51} "MR. MULLIGAN:   Well, we do ranges all the time in Montgomery County so it was, in fact, our understanding that is what the deal would be.   That is sort of a deal breaker.

{¶ 52} "THE COURT:   Well, it might be, but I'm not committing to anything.   You have been in here before, Pat.   You know I don't commit to anything.

{¶ 53} "MR. MULLIGAN:   Maybe we should have talked to the Court before we came in.

{¶ 54} "THE COURT:   I don't know.

{¶ 55} "MR. MULLIGAN:   So we can't proceed this afternoon then.

{¶ 56} "THE COURT:   Okay.   It's up to you guys. Whatever you want to do.

{¶ 57} "WHEREUPON, discussion at Bench concluded.   Proceedings continued as follows:

{¶ 58} "THE COURT:   Are you still going to proceed on the Bill?

{¶ 59} "MR. GALL:   I don't believe so, your Honor.

{¶ 60} "THE COURT:   All right.   Then we're going to withdraw the Bill.

{¶ 61} "MR. MULLIGAN:   Well, I need to obviously have a conversation with the client.   I need to have a conversation –

{¶ 62} "THE COURT:   Do you want a recess, or what do you want to do?

{¶ 63} "MR. MULLIGAN:   Well, I think that that would certainly be appropriate.

{¶ 64} "THE COURT:   Just take a short recess right now?

{¶ 65} "MR. MULLIGAN:   We'll take a recess for right now.   Yes.

{¶ 66} "THE COURT:   All right.   We'll take a ten minute recess.

{¶ 67} "WHEREUPON, a recess was taken at 2:50 p.m.[1]   At 3:26 p.m., proceedings continued as follows:

{¶ 68} "THE COURT:   It's my understanding you're ready then to proceed with the plea, is that correct, Mr. Mulligan?

{¶ 69} "MR. MULLIGAN:   Yes, your Honor.

{¶ 70} "THE COURT:   All right.   We'll pick up where we left off, Mr. Liskany.   It's my understanding that you and your counsel have negotiated a plea agreement with the State of Ohio. [The trial court repeats the plea agreement recited previously.]   Is that your understanding of the agreement that you and your counsel have negotiated with the State of Ohio?

{¶ 71} "A:   Yes, your Honor.

{¶ 72} "THE COURT:   Do you acknowledge and consent to that agreement?

---

[1]   The controversy regarding the conversation that took place during this recess will be discussed below.

**{¶ 73}** "A:   Yes, your Honor.

**{¶ 74}** "THE COURT:   Have there been any other agreements or promises made to you other than that agreement?

**{¶ 75}** "A:   No, your Honor.

**{¶ 76}** "THE COURT:   Do you understand that agreement is between you and the State of Ohio, it does not necessarily bind the Court to go along with that agreement. The Court can go along with it but is not required to go along with it.

**{¶ 77}** "A:   Yes, your Honor."

**{¶ 78}** The state then provided a recitation of the factual basis for the charges.

**{¶ 79}** "THE COURT:   You're entering this plea of guilty because that is what you did, you are guilty?

**{¶ 80}** "A:   Yes, your Honor.

**{¶ 81}** "THE COURT:   Do you understand what the maximum possible punishment is the Court could impose for these offenses?

**{¶ 82}** "A:   Yes, your Honor.

**{¶ 83}** "THE COURT:   What is that, sir?

**{¶ 84}** "A:   21 years.

**{¶ 85}** "THE COURT:   That's correct.   Do you understand what the maximum possible fine is the Court could impose?

**{¶ 86}** "A:   Yes, your Honor.

**{¶ 87}** "THE COURT:   What is that?

**{¶ 88}** "A:   $40,000.

**{¶ 89}** "THE COURT:   That's also correct.   Now, understanding that the

maximum possible punishment is 21 years in prison and a $40,000 fine, do you still wish to go forward with your plea?

{¶ 90} "A:   Yes, your Honor."

{¶ 91} The trial court accepted Liskany's plea, ordered that a presentence-investigation report be conducted and set a sentencing hearing date.

{¶ 92} At the sentencing hearing, Liskany produced three people who made statements on his behalf during the hearing, all attesting to his good character.

{¶ 93} The prosecutor then made the following statement:

{¶ 94} "The State has recommended a sentence of not less than four years. Anything this court does less than that demeans the physical and psychological abuse they endured at Mr. Liskany's hands over an extended period of time."

{¶ 95} At that point, Mulligan noted that the prosecutor had mistakenly stated that its recommendation was for "not less than four years," rather than the correct recommendation of "not more than four years."   The prosecutor merely replied, "We made our record."

{¶ 96} The presentence-investigation report submitted to the trial court prior to sentencing shows that Liskany has had at least 20 traffic violations since 1996.   He also was convicted of criminal trespassing in 2002, for which the jail sentence was suspended on the condition that he not violate any laws for a period of five years.   The PSI shows that Liskany was convicted of child endangering in 2000.   That conviction stemmed from Liskany causing second-degree burns to J.L.'s feet by holding the child in a tub of scalding water.   Liskany then put the child to bed with socks on his feet and did not report the injury to his wife until the next day.

{¶ 97} Of relevance to this appeal the PSI contained a letter from Eric Spicer, a captain with the Greene County Sheriff's Office.[2]  The letter, typed on official Greene County Sheriff's Office letterhead, states as follows:

{¶ 98} "Dear Judge Campbell:

{¶ 99} "On October 27, 2008, the defendant, David O. Liskany, pled guilty to three felony charges.   Those charges were two second degree felonious assault charges and one count of attempted felonious assault.   These charges were just a small part of a lengthy 10 count indictment by the Greene County Grand Jury.   The remaining charges have been dropped by the prosecutor's office in exchange for his pleas.   Each charge was the result of a long and very in-depth investigation that found probable cause to believe the defendant to be a dangerous serial child abuser, with disturbing methods of his criminal conduct.

{¶ 100} "In my 18 years of police work, I have never come across a worse case of systematic mind control and physical abuse from a parent upon their own children.   In my supervision of this case during the investigative phase I learned of Mr. Liskany's approach to parenting, and just how sadistic one could be in the privacy of their home when no one is looking.

{¶ 101} "This case started when the eldest son (age 13) left his home under extreme weather conditions to walk for three days and two nights to find someone he could trust to end the terrible and sometimes torturous life he and his younger siblings were living.   This amazing step put into motion the subsequent investigation that has now culminated in the admissions of the defendant; these include extreme types of

---

[2]   This letter came to our attention while reviewing the PSI report in connection with this appeal.

abuse, like 'water torture' and the use of an electric shock animal training collar. It's hard to imagine the lasting effects this has caused the children. However, it is comforting to know one of them was capable and brave enough to resist this bondage and go for help.

{¶ 102} "The court will soon learn that Mr. Liskany has a prior conviction in Warren County Ohio for abusing one of his children. As if that is not enough he even has a pending charge for violating a protection order in another court where the CPO is a result in this case. The court will also see for itself a man who will arrive for sentencing with absolutely no remorse for his despicable crimes. He has caused his own children's placement into intensive psychiatric care, for what is characterized as the 'most severe case of PTSD.' I am not surprised at this, as Mr. Liskany never cooperated with the investigation and interfered with repeated lies. Therefore, it is my hope the court will recognize the only chance these children have to recover are adduced within the protection only the court may now accord.

{¶ 103} "The set of facts that have now been shared with the presentence investigator are of the nature that they would shock the conscience of the court if they were made up, but in this case they are true. The case has been pleaded out and the prosecutor's office has done a fine job in securing convictions. However, Mr. Liskany took the plea in the hopes to avoid a long stay in prison. The prosecutor's office took the pleas to secure a conviction and to protect the children from further anguish of having to face this sad excuse of a man. The child psychologist who has rendered an opinion after extensive time with the victims has stated that further court interaction and the threat of testifying would bring the children additional harm. Again the damage done to the kids in this case is so severe that further sight of the man will bring new and additional long term

harm. It is for this reason I write you seeking strong consideration that the court will take the appropriate steps to both punish the defendant and protect these children for the longest possible period. Simply put, these children need the court to protect them from further harm. Their mother has proven she won't do it, and their father (the defendant) isn't capable of anything but being the household king of pain.

{¶ 104} "I hope not to beguile you, as I do know you to be a diligent and focused jurist and will most assuredly visit in full, the presentence investigation. I ask you to forgive this approach to convey my concern for these children. I could not allow this day to pass without doing something to affect the only plea that remains; the plea of the eldest child who sought out help, breaking away from his imprisonment, while fearing the ultimate consequence, to ask someone to protect him and his younger, defenseless brothers and sister. That plea was for help and protection.

{¶ 105} "On their behalf that request is now mine.

{¶ 106} "Sincerely and respectfully,

{¶ 107} "/s/ Captain Eric Spicer

{¶ 108} "Captain Eric Spicer

{¶ 109} "Criminal Investigations Commander."

{¶ 110} The probation officer who prepared the PSI made the following recommendation with regard to the sentence:

{¶ 111} "A prison recommendation of sixteen years is recommended for several reasons. The defendant's prior criminal history indicates a conviction of Child Endangering through Lebanon Municipal Court, Case Number 2000 CRB 0874. The defendant shows little remorse for the criminal acts that he committed; however shows

remorse for being involved in the current legal situation. The defendant has manipulated the children for years. Even in the victim apology letter that was written by the defendant, he continues to manipulate the children, persuading them that it was 'their fault' for his actions. The defendant also places blame on his wife for his method of discipline and advised that she was okay with his discipline method. The defendant went on to state that 'it appears that [his wife] has succeeded in convincing everyone that she is the heroine and I am the villain.' The defendant has physically, emotionally and mentally harmed these three young children, ages fourteen, twelve, five and two for life. Because of the defendant's actions, this officer recommends a sixteen year prison sentence so that when the defendant is released from prison, the youngest child will be the age of eighteen."

{¶ 112} The court sentenced Liskany to a total of 16 years in prison with a mandatory postrelease-control period of three years. Liskany retained new counsel and appealed his conviction and sentence to this court. Thereafter, Liskany filed a motion to vacate the plea and sentence, based upon the claim that the state reneged on its agreement to recommend a sentence of not more than four years and upon the claim that the trial court, during sentencing, made a mistake with regard to the period of postrelease control that would apply to Liskany. The trial court overruled the motion on the ground that the pending appeal deprived the court of jurisdiction to determine the motion.

{¶ 113} Liskany dismissed his pending appeal in this court, and refiled his motion to vacate his plea and sentence. The motion was identical to the motion he had previously filed in the trial court while his appeal was pending. Liskany filed a supplemental affidavit in support of his motion to vacate. In his affidavit, Liskany averred

that Mulligan had induced him to enter into the plea agreement by telling him (1) that he would get a sentence of four years without serving any mandatory time, (2) that the plea agreement was binding on the trial court, and (3) that Liskany was not present during conversations that took place with the judge "behind closed doors." Liskany also averred that Mulligan told him "not to wreck the train."

{¶ 114} At the hearing on his motion, Liskany presented the testimony of his mother, father, and brother, as well as his own testimony. All four testified that prior to the plea hearing they were under the impression that the maximum prison term Liskany could get was four years, but that he would probably only have to serve six months, and there was a good chance he would receive probation instead of a prison sentence.

{¶ 115} Liskany and his family members further testified that when the trial court stated that it was not bound by the agreement, they all accompanied Mulligan into a conference room where Liskany "immediately" stated that he did not want to plead guilty to a crime he did not commit. They all testified that Mulligan essentially assured them that the trial court was merely going through procedure due to the publicity generated by the case. They further testified that Mulligan indicated that they had not been with him when he talked to the judge and that the agreement was still in effect. Liskany testified that Mulligan told them that "I would probably get probation. He said that he had clients that pled guilty to felonious assaults where there was physical evidence and got probation. He didn't know why I wouldn't. And my case there was no physical evidence."

{¶ 116} The Liskanys testified that Mulligan told them that it would take a year to get the matter to trial and that Liskany would not see his children during that time. They

further testified that Mulligan asked Liskany whether he could "do six months" and said that he would be able to see his children sooner by pleading out than if he waited to go to trial. Finally, the Liskanys testified that Mulligan told them "not to wreck the train." All the Liskanys testified that they came out of the conference thinking that Liskany would have to go to prison for only six months.

{¶ 117} Liskany also presented the testimony of attorney Kevin Conners, who opined that Mulligan's representation of Liskany fell below the acceptable standard for effective assistance of counsel. Conners testified that part of his opinion was based upon the belief that Mulligan, his associate, or both, permitted Liskany to be interviewed and evaluated by Esther Battle, a licensed clinical psychologist whose report was submitted to the court.[3] He further opined that Mulligan was ineffective because he failed to assert a spousal privilege, failed to file a motion to suppress jailhouse conversations, and failed to present any mitigating evidence at the sentencing hearing. His findings regarding these instances of omission were based upon his examination of the time records kept by Mulligan's law office with regard to the matter, in the course of which he found no time records pertaining to any of those matters.

{¶ 118} Mulligan testified, during examination by Liskany's counsel, at the hearing on the motion to vacate as follows:

{¶ 119} "Q: Just to set the stage a little bit, it's October 27th, 2008, you're mid-plea and Judge tells you that he's free to make his own decision in this case, and you break and go back in one of the conference rooms here, probably a Jury room, and have a conference with Elaine Liskany, David Liskany, Steve Liskany, and Ed Liskany, is that

---

[3] The report in question was not submitted to the trial court prior to sentencing and was prepared in regard to a different case.

correct?

{¶ 120} "A:   I remember David being there.   I remember others being there but I can't say who was there.

{¶ 121} "Q:   Do you deny them being there?

{¶ 122} "A:   No, I remember having a conversation with David and there was other people there.

{¶ 123} " * * *

{¶ 124} "Q:   So in their presence, since you don't deny that they were there, at this very meeting did you tell David or all of them that he would get probation, or at the worst six months?

{¶ 125} "A:   No.

{¶ 126} "Q:   Did you tell him that he couldn't get a fair trial?

{¶ 127} "A:   No.

{¶ 128} "Q:   Did you tell him not to wreck the train?

{¶ 129} "A:   I don't ever remember using those words.

{¶ 130} "Q:   Is that a no?

{¶ 131} "A:   I don't remember using those words.

{¶ 132} "Q:   Did you tell him that this was a one time offer?

{¶ 133} "A:   I don't recall the exact words that were said.   I know generally what was said but I don't recall the exact words that were said.

{¶ 134} "Q:   Did you tell him that if he pled under or was convicted under Case Number 860, that he would have to register as a child offender?

{¶ 135} " * * *

{¶ 136} "A:   Possibly.   Under the current state of the law at that time, there was a section of child endangering that did require you to register as a child victim offender. There was under his section of the indictment not a requirement at that time, but we had a long conversation on the 23rd at my office about how the Adam Walsh Act had expanded the sexual offender registration requirements and the likelihood that that could happen in the future could affect him, and so there was an advantage to pleading to the amended charges through the bill of information so as to avoid that in the future because of the way the Ohio State legislature had changed the rules in the middle of the game and it applied retroactively back.   I wanted and felt an obligation to advise him that the same thing could happen to him in the future with this case.

{¶ 137} " * * *

{¶ 138} "Q:   Did you tell him the Judge has to say what he has to say?

{¶ 139} " * * *

{¶ 140} "A:   I don't recall saying that.   What I said was that the Judge is required to advise you of everything in Rule 11, and there's a whole host of things that we talked about.

{¶ 141} "Q:   Did you tell him to ignore the Judge?

{¶ 142} "A:   No.

{¶ 143} "Q:   Did you tell him that you've been an attorney longer than he has been a Judge?

{¶ 144} "A:   No.   I think the opposite would be true.

{¶ 145} "Q:   Did you tell him there is no guarantee on this deal until he pleads?

{¶ 146} " * * *

{¶ 147} "A:   No.

{¶ 148} "Q:   Did you tell him that he didn't know what was said behind closed doors?

{¶ 149} "A:   No.   What I informed him of what was said behind closed doors.

{¶ 150} "Q:   That is not the question.   Did you tell him he's supposed to go along with your idea to plead guilty because he didn't know what was said behind closed doors?

{¶ 151} " * * *

{¶ 152} "A:   No, but I informed him of the things that were said behind closed doors.   I informed him of what the Judge said months ago to my associate that he was a, quote, good candidate for judicial release.   That came from the Judge's mouth in a final pretrial.   That is the information that was given to him that he had to digest whether he wanted to do the plea.

{¶ 153} " * * *

{¶ 154} "Q:   Well, you pulled up on the plea; it was enough to cause you to get in there and tell him not to wreck the train, wasn't it?

{¶ 155} "A:   We paused because I was attempting to lock in what was agreed to by myself and Mr. Gall."

{¶ 156} When asked why he did not prepare Liskany for his evaluation by Dr. Battle, Mulligan indicated that he and his associate had both told Liskany not to submit to the examination.

{¶ 157} Following the hearing, the trial court overruled the motion to vacate.   From the order overruling his motion, Liskany appeals.

{¶ 158} The Spicer letter came to our attention during our review of the record.

Because it appeared that Liskany was unaware of the letter at any time during the proceedings, we entered an order permitting Liskany to review the letter and to submit supplemental briefing on the issue of whether the state breached its agreement with respect to a sentencing recommendation, in light of the letter from Spicer. Both parties submitted supplemental briefs on that issue.

II

{¶ 159} Liskany's first assignment of error provides as follows:

{¶ 160} "The trial court abused its discretion in denying appellant's motion to vacate his plea."

{¶ 161} Liskany's argument in support of this assignment of error is threefold. First, he contends that his plea was not made voluntarily because of misrepresentations made by trial counsel. Second, he claims that trial counsel was ineffective. Finally, Liskany contends that the prosecutor "recommended a longer sentence at sentencing than agreed to at the plea."

{¶ 162} Crim.R. 32.1 provides: "A motion to withdraw a plea of guilty or no contest may be made only before sentence is imposed; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his or her plea."

{¶ 163} This court has stated: " 'The distinction between pre-sentence and post-sentence motions to withdraw pleas of guilty or no contest indulges a presumption that post-sentence motions may be motivated by a desire to obtain relief from a sentence the movant believes is unduly harsh and was unexpected. The presumption is nevertheless rebuttable by showing of a manifest injustice affecting the plea. "A

'manifest injustice' comprehends a fundamental flaw in the path of justice so extraordinary that the defendant could not have sought redress from the resulting prejudice through another form of application reasonably available to him or her." ' " *State v. Renner,* Montgomery App. No. 24019, 2011-Ohio-502, ¶ 13, quoting *State v. Brooks*, Montgomery App. No. 23385, 2010-Ohio-1682,¶ 6-8.

**{¶ 164}** A defendant bears the burden of proving that a manifest injustice has occurred. *State v. Smith* (1977), 49 Ohio St.2d 261, 264. We review the trial court's decision to grant or deny such a motion under an abuse-of-discretion standard. Id.

**{¶ 165}** Liskany first argues that his trial attorney made misrepresentations that induced him to enter the plea; therefore, he argues that his plea was not made knowingly, intelligently, or voluntarily. Specifically, Liskany argues that his attorney promised him that "he had discussions with the court about his sentence, and he would likely get probation, but certainly no more than four years of incarceration."

**{¶ 166}** "In order to be constitutionally valid and comport with due process, a guilty plea must be entered knowingly, intelligently, and voluntarily." *State v. Fisher*, Montgomery App. No. 23992, 2011-Ohio-629, ¶ 6, citing *Boykin v. Alabama* (1969), 395 U.S. 238. " 'The determination that there has been an intelligent voluntary waiver with understanding of rights is a subjective procedure. It can be accomplished by short direct inquiry, investigation or lengthy interrogation. Each determination must be made on an ad hoc basis. The depth and breadth of the interrogation depends upon the totality of circumstances surrounding each case.' " Id. at ¶ 11, quoting *State v. McKee* (1976), 50 Ohio App.2d 313, 314.

**{¶ 167}** This court has stated: "A change of heart after becoming aware of an

imminent, unexpectedly harsh sentence does not entitle a defendant to withdraw his guilty plea. A manifest injustice generally does not result when a defendant holds (as he discovers) a mistaken belief that his sentence would be significantly lighter than the one actually imposed. The reason for the belief is key. If defense counsel caused the belief, what counsel exactly said must be examined. A manifest injustice does not necessarily arise merely because counsel is wrong about the sentence that is actually imposed. Only if counsel promised the defendant that a guilty plea will result in a lower sentence than is actually imposed would a manifest injustice potentially result. If counsel simply made a prediction, there would be no manifest injustice. In other words, counsel's erroneous advice and incorrect speculation regarding the sentence that is likely to be imposed potentially results in a manifest injustice only if counsel said that a guilty plea *will* result in a particular sentence, but not if counsel said that it *probably* will result." (Emphasis sic; citations omitted.) *State v. McComb*, Montgomery App. Nos. 22570 and 22571, 2008-Ohio-295, ¶ 9.

{¶ 168} A review of the plea hearing reveals a thorough Crim. R. 11 colloquy. During that colloquy, the trial court indicated that it was not bound by the plea agreement. The trial court permitted Mulligan to take a recess and discuss the matter with Liskany. The conversation that took place between Mulligan and Liskany during the recess is in dispute and was a matter of contention during the hearing on the motion to vacate.

{¶ 169} None of the Liskanys testified that Mulligan made any affirmative promise during the disputed recess conversation as to the exact prison term the judge would impose. Indeed, they all testified that they could not recall the exact words Mulligan used to convince them that a guilty plea was the best option. Furthermore, they all stated that

Mulligan discussed the "possibility" of serving six months. Liskany's mother, Elaine Liskany referred to Mulligan's statements as "legal speak," which caused them to tell Liskany to "trust his attorney."

{¶ 170} Conversely, Mulligan testified that he did not use the words "don't wreck the train." He further denied making any assertions as alleged by the Liskanys. He further testified that he informed his client of all conversations made during the plea negotiations and that Liskany decided to go ahead with the guilty plea.

{¶ 171} With regard to that conversation, the trial court determined which witnesses it found most credible. To that end, the trial court stated:

{¶ 172} "While there are disputed issues of fact as to what was said by Mr. Mulligan at the recess in the plea hearing, the Court must look to the credibility of the witnesses in making its determination. While there is no specific motivation to question the credibility of the Liskany family, the fact that they are all related to the Defendant and have an interest in the result for the benefit of that family member, their credibility must be weighed against the testimony of Mr. Mulligan who specifically denies their allegations as to what was said during the plea recess."

{¶ 173} In other words, the trial court determined that it found Mulligan to be the more credible witness with regard to what was said during the plea recess. From our review of the record of the hearing on Liskany's motion to withdraw his plea, we cannot say that the trial court abused its discretion in making that determination. Thus, we conclude that the trial court did not err in finding that Mulligan did not make misrepresentations to Liskany.

{¶ 174} We also find Liskany's claims of ineffective assistance of counsel to be

unfounded. In order to substantiate a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 175} Liskany first contends that counsel was ineffective due to counsel's misrepresentation regarding sentencing. For the reasons set forth above, we conclude that the trial court did not err in finding a failure of proof for the factual predicate for this claim.

{¶ 176} Liskany's next claim of ineffectiveness rests upon his claim that Mulligan's associate, Nick O'Bryan, handled the majority of the case. Liskany argues that "this young attorney was not competent to handle this case, as he was too inexperienced to understand its magnitude, being licensed for only seven weeks before [the] arraignment."

{¶ 177} Liskany's argument that O'Bryan lacked experience appears to be based solely upon the fact that O'Bryan was recently licensed. Liskany has the burden of proof on the issue of ineffectiveness due to lack of experience, because "a properly licensed attorney is presumed competent." *State v. Gondor,* 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 62. Liskany fails to point to any specific deficiency in O'Bryan's handling of the proceedings. Furthermore, there is evidence in the record upon which the trial court could rely in finding that Mulligan was supervising O'Bryan and was significantly involved in every phase of Liskany's representation. Thus, we find that this argument lacks merit.

{¶ 178} Liskany also claims that counsel was deficient for failing to seek exclusion of "jailhouse tapes" or to assert a spousal privilege with regard to Liskany's wife. This

argument is based upon the testimony of Liskany's expert, Conners, who opined that Mulligan should have performed both of these actions and that his failure to do so rendered his representation ineffective. But Conners admitted to having been unaware that before Liskany had made any telephone calls, Liskany had been informed that his telephone conversations would be taped. Conners admitted that the warning that Liskany's calls would be tape-recorded would render useless a motion to suppress those recordings. Furthermore, Conners testified that he was not sure whether the spousal privilege would be applicable to this case and was unable to state the legal basis for asserting a spousal privilege in this case. Based upon this testimony, which consisted of broad assertions without any factual support, the trial court could reasonably determine that counsel's performance with regard to these matters was not deficient.

{¶ 179} Liskany also claims that Mulligan wrongly told him that "he may have to register similar to a sex offender if he pleaded guilty to child endangering." From the record, it appears that Mulligan had a conversation with Liskany concerning changes in the sexual-offender law that occurred with the passage of the Adam Walsh Act. According to Mulligan, he merely advised Liskany that there was a slight possibility that the General Assembly could tinker with the law in the future in such a way that he would be subject to registration requirements. Mulligan admitted that the current sexual-offender-registration law did not cover the child endangering. But he testified that he felt it would be to Liskany's advantage to plead to felonious-assault charges and have the endangering-children charges dismissed, so that there would be no risk of future exposure to registration requirements. Based upon this testimony, the trial court was again free to believe Liskany or Mulligan. The trial court chose to credit Mulligan—a

decision we cannot say amounted to an abuse of discretion. And we do not find that Mulligan was deficient for advising his client of what he saw as a potential problem that could arise in the future if his client pleaded guilty to child endangering.[4]

{¶ 180} Liskany also contends that counsel was ineffective based upon Conners's testimony that counsel should not have allowed Liskany to be interviewed by Dr. Battle for the psychological evaluation. In July 2008, Ester Battle, a licensed clinical psychologist, performed an evaluation of the Liskany family for the Greene County Juvenile Court. According to Liskany's testimony, Mulligan told him to submit to the evaluation. According to his brother, Liskany wanted an evaluation, but did not get one. Mulligan, however, testified that both he and O'Bryan advised Liskany not to submit to the examination but that Liskany decided to do so against counsel's advice. Again, the trial court was in the better position to assess credibility on this issue, and it found Mulligan's testimony more credible. In any event, the report produced by Dr. Battle was not admitted in evidence in this case until after the filing of Liskany's motion to vacate. Thus, the report could not have prejudiced Liskany with regard to sentencing. Significantly, as noted by the trial court in its decision denying the motion to vacate, Connor testified that he was not aware that the trial court had not seen the report prior to sentencing and that his knowledge that the trial court had not seen the report did affect his opinion on the issue of counsel's deficiency.

{¶ 181} Conners also testified that there appeared to be "little evidence" that

---

[4]Of course, Mulligan's advice preceded *State v. Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, in which it was held that the changes to sexual-offender-registration requirements set forth in the Adam Walsh Act, 2007 Am.Sub.S.B. 10, cannot be applied retroactively to persons whose offenses preceded the act's enactment.

Mulligan did any preparation for this case. This testimony was based upon his examination of the records and of Mulligan's billing statements. Mulligan testified that this case began as a flat-fee case for which he did not record his hours. Mulligan further testified that when it was decided that the case would be billed on an hourly basis, he began to keep time records. He testified that the time records examined by Conners therefore do not record the total work performed on the case. Conners admitted on cross-examination that he was unaware of these facts.

{¶ 182} The trial court found that Liskany failed to demonstrate any deficiency in Mulligan's preparation for the case. There is evidence that Mulligan and O'Bryan had numerous meetings with Liskany. The record also shows that Mulligan filed witness lists, that he filed a motion in limine, and that he produced witnesses to testify on Liskany's behalf at sentencing. More importantly, Mulligan was able to negotiate the reduction in charges from ten counts of endangering children (all second-degree felonies) down to two counts of felonious assault (second-degree felonies) and one count of attempted felonious assault (a third-degree felony).

{¶ 183} We conclude that the trial court did not abuse its discretion in finding that Liskany failed to support his claim of ineffective assistance of counsel.

{¶ 184} We next turn to the claim that the state reneged on its plea-agreement deal when, during sentencing, the prosecutor stated that it recommended a sentence of "not less than four years." The plea-agreement form sets forth the correct agreement. The prosecutor stated the correct agreement during the plea hearing. Further, the PSI set forth the agreed upon "not more than four years" term. There is nothing to indicate that the trial court thought the prosecutor recommended a sentence of "not less than four

years." Both Mulligan and two prosecutors later filed affidavits in which they aver that, although not caught by the court reporter at sentencing, the court was apprised of the correct agreement. One apparent slip of the tongue does not require a finding that the state failed to adhere to its agreement or rendered the plea involuntary.

{¶ 185} We conclude that the trial court did not err in overruling Liskany's motion to withdraw the plea; Liskany failed to demonstrate that a manifest injustice occurred.

{¶ 186} The first assignment of error is overruled.

III

{¶ 187} Liskany's second assignment of error, set forth in his supplemental brief, provides:

{¶ 188} "Captain Spicer's request for a sentence inconsistent with the plea agreement violated the terms of appellant's plea agreement because the state and its agents are bound by the terms of the plea agreement."

{¶ 189} Liskany contends that the plea agreement was violated by the submission of Captain Spicer's letter to the trial court.

{¶ 190} " ' It has been recognized that plea agreements are essential to the prompt disposition of criminal proceedings.' " *State v. Blake*, Franklin App. No. 10AP-992, 2011-Ohio-3318, ¶ 16, quoting *State v. Burks,* Franklin App. No. 04AP–531, 2005–Ohio-531, ¶ 18. A plea agreement constitutes a contract between the [s]tate and a criminal defendant and is subject to the general law of contracts. *State v. Butts* (1996), 112 Ohio App.3d 683, 685-686. "Generally, however, a plea agreement between the state and the defense is not binding on the court, as the ultimate decision of whether or not the agreement is accepted rests with the trial judge." *State v. Burks* at ¶ 18.

However, if one side violates a term of the plea agreement, the other party has a right to pursue appropriate remedies, including rescission of the agreement. *State v. Hart,* Cuyahoga App. No. 84531, 2005-Ohio-107, at ¶ 8.

{¶ 191} We cannot determine with certainty whether the trial court relied upon Captain Spicer's letter in determining the length of the sentence to be imposed, but it does appear that the letter was at least read and considered—it was typed, verbatim, into the PSI report. Within Spicer's letter is a request that the trial court impose the longest possible punishment. This request contradicts the recommendation to which the state agreed as part of the plea bargain. This, combined with the large discrepancy between the state's recommended sentence of "not more than four years" and the 16-year sentence imposed by the trial court, raises the issue of whether the state honored the terms of the plea agreement.

{¶ 192} We conclude that because the letter was issued by an agent of the state, it constitutes an improper attempt to influence the sentencing by breaching the state's promise to recommend a sentence of "not more than four years." Accordingly, the second assignment of error is sustained.

{¶ 193} In reviewing the record, we came across several written communications other than Captain Spicer's letter, some of which are critical of Liskany and imply, at least, a view that his punishment should be more severe, and some of which are in praise of Liskany and expressly or implicitly support a more lenient sentence. Unlike Spicer's letter, which is relevant to Liskany's claim that the state breached its agreement, as part of the plea agreement, to recommend a sentence of not less than four years, the existence of these other letters, and the possibility that they may have been considered by the trial

court in connection with sentencing, is not relevant to any issue Liskany has raised on appeal. Therefore, any issues raised by these other written communications are not within the scope of this appeal, and we need not address or resolve them.

IV

{¶ 194} Liskany's first assignment of error having being overruled, and his second assignment of error having been sustained, the order of the trial court denying Liskany's motion to withdraw his plea is affirmed; the 16-year sentence imposed by the trial court is reversed; and this cause is remanded for resentencing. At the resentencing, the trial court shall not consider the Spicer letter in determining the length of sentence to be imposed.

Judgment reversed

and cause remanded.

FROELICH, J., concurs.

DONOVAN, J., dissents.

FROELICH, J., concurring.

{¶ 195} It may well be that the defense attorney believed that his client would be sentenced to four years; however, the judge made it very clear to counsel and appellant that the judge understood the recommendation of the prosecutor and the desire of the defense but that the ultimate sentence was totally within the discretion of the court.

{¶ 196} Counsel, his client, and some family members met privately. We may never know exactly what was said, but the court conducted a hearing and found that any statements made by the defense counsel were the lawyer's predictions or opinions as to

what the judge would do and not the lawyer's promise or the relaying of a promise made by the judge. I can certainly appreciate how the defendant could have subjectively anticipated, based on what he believed he heard, that he was going to receive four years and that he believes that he was misled by his attorney; but the court found that his plea was voluntary, knowing, and intelligent, and I agree that that finding was not an abuse of discretion.

{¶ 197} R.C. 2951.03(B)(1) provides that if a court orders a presentence investigation, the court shall permit the defendant or defendant's counsel to read the report with certain exceptions including "any recommendation as to sentence." In the report that was prepared, under the section "Position of Prosecuting Attorney/Police," it states: "At the time of sentencing, the State will recommend a sentence of not more than four years." The final section, "Recommendation," states that it is "not provided to attorney or State in accordance with ORC § 2951.03(B)(1)(a)." It includes the recommendation of the probation officer and a seriousness and recidivism checklist that she prepared. Then, under "Victim Information," a letter is included from a caseworker and supervisor at Children Services; this letter informs the court of the "serious emotional problems" suffered by the children, the therapy and counseling they have received, and the fact that a "psychiatrist" reported that this was the "most severe case of PTSD that he has ever treated." The letter requests the "highest level of sentencing."

{¶ 198} This section also includes a letter from the foster parents of two of the children regarding the trauma and fear experienced by one of the children. Last is the letter from Captain Spicer (the record does not explain why it was not included in the "non-confidential" section for "Position of Prosecuting Attorney/Police"). While making

his sentencing recommendation, he alludes to damaging opinions from a "child psychologist." There were no reports from a psychiatrist or a child psychologist before the court at the time of sentencing.

{¶ 199} The court also mentions at sentencing that it had "voluminous letters from many people," but these letters are not part of the presentence investigation or otherwise in the record at the time of sentencing. It has been found that "letters from interested parties attempting to persuade the judge to their viewpoint or to bring some information to the judge's attention constitute improper ex parte communications." *State v Sanders*, 188 Ohio App. 3d 452, 2010-Ohio-3433, ¶ 20, citing *State ex rel. Beacon Journal Publishing Co. v. Whitmore* (1998), 83 Ohio St. 3d 61, 63; cf. *State v Johnson*, 164 Ohio App. 3d 792, 2005-Ohio-6826, ¶ 38.

{¶ 200} The United States Supreme Court has held that a defendant is "denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." *Gardner v. Florida* (1977), 430 U.S. 349, 362, 97 S.Ct. 1197, 51 L.Ed.2d 393. Some courts have held *Gardner* limited to capital cases and found no problem with issuing only a summary of the presentence investigation. See, e.g., *State v. Harris*, Williams App. No. WM-09–015, 2010-Ohio–3526, ¶ 24; *Stewart v. Erwin* (CA 6, 2007), 503 F.3d 488, 497. But "[d]ue process certainly would require that defendants be given an opportunity to rebut inaccurate reports * * *." *State v. Funderburg*, Montgomery App. No. 20450, 2005-Ohio-2235, ¶ 12. And how would a defendant be aware of what he believed to be inaccurate information without access to the report or a summary?

{¶ 201} The "recommendation as to sentence" that is excluded by statute from the

defendant's inspection is the recommendation of the probation department, not of every individual, be they law enforcement, social worker, psychologist, or concerned citizen. There is no reason to doubt the facts, conclusions, or sincere opinions of the investigating officer, the foster parents, the CSB caseworkers, Dr. Battle, the psychiatrist, or the "voluminous letters." But these were not made known to the appellant, and although the opinions conclude with a request/suggestion/demand/recommendation for a sentence, they are preceded by facts or the opinions of others. (For example, the children are seeing a psychiatrist and that his or her opinion is that the children are experiencing severe PTSD.)

{¶ 202} While the court has broad discretion in imposing a sentence, a defendant has the right to know, at least generally, what is informing that discretion. If there is information that the court deems should not be made available to the defendant, the court should state the reasons for this decision and make this information part of the record (albeit under seal) and then state on the record a summary of the information so that the defendant can have at least that opportunity to respond or comment.

{¶ 203} I concur in the remand with the mandate that the sentencing judge not consider any opinion from anyone associated with the prosecution or law enforcement, except the prosecutor assigned to the case who recommended not more than four years. Although I agree that this issue is not presently before us, it is my opinion that the trial court should not consider any information, whether it be couched as opinion, fact, or recommendation, from anyone (except its own probation officer) without allowing the defendant and his counsel to comment upon it.

. . . . . . . . . .

DONOVAN, J., dissenting.

{¶ 204} I dissent. In *State v. Lewis,* Greene App. No. 2004-CA-101, 2005-Ohio-3736, ¶ 24, Judge Wolff, in a separate concurring opinion, rightly noted that a "sentencing recommendation is an inducement to forego the right to trial and is only a proper inducement if it is a realistic recommendation."

{¶ 205} While the prosecutor herein recommended the sentence agreed upon in the plea agreement, the investigating officer advised the court in writing that Liskany was a "dangerous serial child abuser" and that the officer had "never come across a worse case of systematic mind control and physical abuse" in 18 years of police work. This letter was part of the presentence report provided to the judge, and since it was part of the recommendation section, it likely was never viewed by defense counsel. R.C. 2951.03(B)(1)(a). Statements of this nature clearly run afoul of the recommended sentence by the prosecutor and in my view establish that the plea recommendation was indeed meaningless and lacking in good faith. Because the recommendation was wholly unrealistic, it was an improper inducement. See *Lewis,* Wolff, J., concurring, ¶ 24.

{¶ 206} I find instructive the reasoning in *State v. Matson* (Wis. App. 2003), 268 Wis.2d 725, 674 N.W.2d 51. Matson appealed from convictions for child abduction and burglary as a repeat offender and from an order denying his petition for postconviction relief, arguing that the investigating officer's letter addressed to the sentencing court requesting the maximum sentence undermined the plea agreement, which provided that the state and Matson would jointly recommend at sentencing a 10-year confinement with 10 years of extended supervision on one count and 15 years of consecutive probation on the second count. Matson did not move to withdraw his plea, but moved the court to

exclude the letter from the court's sentencing decision, arguing that it was "in essence, a breach of the plea agreement." Id., ¶ 7. The district attorney did not oppose Matson's motion.

{¶ 207} The circuit court "admitted that it had read the letter but not 'seriously.' The circuit court had also forwarded the letter to the presentence investigation writer who, in the court's view, was the court's 'filter to assess and evaluate what anybody tells the agent, including [the] letter * * * .' The circuit court noted it would consider the letter 'insofar as it is given to me through the Department of Corrections.' Matson objected to this procedure." Id., ¶ 8.

{¶ 208} At sentencing, the state and Matson made their joint recommendation. The presentence investigation report recommended "the maximum sentence on the abduction conviction and five years less than the maximum on the burglary conviction, to be served consecutively." Id., ¶ 9. The court sentenced Matson to the maximum 25 years for abduction, with 18 years and 9 months of confinement and 6 years and 3 months of extended supervision, and to a consecutive 15-year probationary term for burglary. In his petition for postconviction relief, Matson requested resentencing before a different judge with a new presentence report, arguing that the "neutrality of the presentence writer was undermined by the circuit court directing him to consider the improper letter." Id., ¶ 12.

{¶ 209} In thorough analysis, the *Matson* court first noted:

{¶ 210} "An accused has a constitutional right to the enforcement of a negotiated plea agreement. Consequently, once an accused agrees to plead guilty in reliance upon a prosecutor's promise to perform a future act, the accused's due process rights demand

fulfillment of the bargain.    A prosecutor who does not present the negotiated sentencing recommendation to the circuit court breaches the plea agreement.

{¶ 211} "* * * 'The State may not accomplish by indirect means what it promised not to do directly, and it may not covertly convey to the trial court that a more severe sentence is warranted than that recommended.' "    (Citations omitted.)    268 Wis.2d 725, 674 N.W.2d 51, quoting (without citing) *State v. Hanson* (Wis.App.1999), 232 Wis.2d 291, 606 N.W.2d 278.

{¶ 212} This is exactly what happened in Liskany's case.    The *Matson* court next examined cases addressing the issue before it, finding persuasive the reasoning of the Florida Supreme Court in *Lee v. State* (Fla.1987), 501 So.2d 591, 593 ("once a plea bargain based on a prosecutor's promise that the state will recommend a certain sentence is struck, basic fairness mandates that no agent of the state make any utterance that would tend to compromise the effectiveness of the state's recommendation"), as well as the policy reasons set forth in dissent in *State v. Sanchez* (2002), 146 Wash.2d 339, 359-361, 46 P.3d 774.    *Matson* at ¶ 22.    The *Matson* court determined:

{¶ 213} "Because an investigative officer is the investigating arm of the prosecutor's office, principles of fairness and agency require us to bind the investigating officer to the prosecutor's bargain.    When a defendant pleads guilty to a crime, he waives significant rights, including the right to a jury trial, the right to confront his accusers, the right to present witnesses in his defense, the right to remain silent and the right to have the charges against him proved beyond a reasonable doubt.    If the guilty plea is part of a plea bargain, the State is obligated to comply with any promises it makes.    When a plea rests in any significant degree on a promise or agreement of the prosecutor so that it can

be said to be part of the inducement or consideration, such promise must be fulfilled.

{¶ 214} "* * *

{¶ 215} "Investigating officers are so integral to the prosecutorial effort that to permit one to undercut a plea agreement would, in effect, permit the State to breach its promise. If the prosecutor is obligated to comply with plea bargain promises, then the prosecutor's investigating officers may not undercut those promises by making inconsistent recommendations." *Matson*, 268 Wis.2d 725, 674 N.W.2d 51, ¶ 23-25.

{¶ 216} The *Matson* court concluded that "statements of the investigating officer for purposes of the sentencing hearing are the statements of the prosecutor. A prosecutor may not undercut a plea agreement directly or by words or conduct. Nor may he do so by proxy." Id., ¶ 23, ¶ 25.

{¶ 217} It was of significance to the *Matson* court that the actions of law enforcement are imputed to district attorney's office in other contexts. "In terms of discovery, the State is charged with knowledge of material and information in the possession and control of others who have participated in the investigation and evaluation of the case. Unconstitutional searches and seizures by law enforcement officers can result in suppression of evidence or even dismissal of a prosecutor's charges." (Citation omitted.) Id. ¶ 26. The *Matson* court imputed the investigating officer's letter addressed to the circuit court to the prosecutor, concluding that the letter "constituted a material and substantial breach of the plea agreement. Prejudice is presumed and always results from such a manifest injustice." Id., ¶ 27. The court ordered that Matson be resentenced and that a new presentence report be prepared.

{¶ 218} The majority herein is satisfied that the trial court indicated to Liskany that it

was not bound by the terms of the plea agreement and that Liskany indicated that he understood that fact. Liskany's attorney, however, testified: "I informed [Liskany] of the things that were said behind closed doors. I informed him of what the Judge said months ago to my associate that he was a, quote, good candidate for judicial release. That came from the Judge's mouth in a final pretrial. That is the information that was given to him that he had to digest whether he wanted to do the plea." It is also crystal clear from the record that counsel was ill-prepared for the plea hearing, erroneously informing Liskany based upon his young associate's errors that the sentence was an agreed four-year term, and the court did the bare minimum to dispel that misunderstanding.

{¶ 219} On this record, I would find that Liskany's plea was not entered knowingly, voluntarily, or intelligently. I conclude that Liskany's plea rested in large part upon a meaningless and unrealistic recommendation by the prosecutor, one completely at odds with the investigating officer's evaluation of the case. This hollow and sham inducement was only exacerbated by defense counsel's ill-preparedness and advice that, according to the judge, Liskany was a good candidate for judicial release. I note that this assertion regarding judicial release was not addressed by the trial court, and Liskany's 16-year sentence clearly makes him ineligible for judicial release. Implicit in the investigating officer's letter is a recommendation for a harsher sentence, and in my view the letter demonstrates that the recommendation of not more than four years was not made in good faith. As in *Matson*, I believe that a manifest injustice is demonstrated, thus I would find that the trial court abused its discretion in denying Liskany's motion to withdraw his plea. In reaching this conclusion, I am mindful of the gravity of these charges, but I believe the law compels a reversal.

_____