[Cite as *State v. Thompson*, 2018-Ohio-5308.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. John W. Wise, P.J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | Case No. 18CA9 |
| | : | |
| JOHN PAUL THOMPSON | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING: Appeal from the Richland County Court of Common Pleas, Case No. 2016 CR 0534 D

JUDGMENT: AFFIRMED

DATE OF JUDGMENT ENTRY: December 24, 2018

APPEARANCES:

For Plaintiff-Appellee:                    For Defendant-Appellant:

GARY BISHOP                              RANDALL E. FRY
RICHLAND CO. PROSECUTOR           10 West Newlon Place
JOSEPH C. SNYDER                        Mansfield, OH 44902
38 South Park St.
Mansfield, OH 44902

*Delaney, J.*

{¶1} Appellant John Paul Thompson appeals from the January 22, 2018 Sentencing Entry of the Richland County Court of Common Pleas. Appellee is the state of Ohio.

## FACTS AND PROCEDURAL HISTORY

{¶2} On August 23, 2015, Ross Wind had relationship problems with his girlfriend and called to ask appellant, a long-time friend, to come over to commiserate. Appellant drove to Wind's house in his white Silverado pickup truck. The two proceeded to sit in Wind's backyard and drink beer. At some point, they left Wind's house in the truck to go to a restaurant, where they ordered a pitcher of margaritas.

{¶3} Ordering the margaritas is Wind's last memory of that day.

{¶4} In the meantime, Kelly Potoczny was on her way home from a work event on Route 13 South in Mansfield. She was driving a Kia Sportage and speaking to her son on a Bluetooth hands-free speaker. Kelly's brother, who worked at the same event, followed her in his own vehicle, a few cars behind in traffic.

{¶5} Kelly was proceeding on her way after stopping at a light when she became alarmed to see a white truck "barreling" toward her from the opposite direction. She knew the truck was about to hit her. Kelly doesn't remember anything more about the crash, but awakened to her son screaming "Mom" over the Bluetooth. Her airbags had deployed and the air was filled with gray smoke. She was trapped in her vehicle by the impact and responding firefighters and EMTs had to extract her with the "jaws of life." Kelly was distraught because she couldn't feel her legs and panicked when firefighters started

breaking the glass of her vehicle to get to her. The first responders allowed her brother to stay with her on the scene to keep her calm as she was extracted from the vehicle.

{¶6} Joan Schoenfelt is a home health aide and was driving on South Main on her way back to her office. She was disturbed to notice a white truck behind her in her rearview mirror, traveling at a very high rate of speed. Joan stopped and let the truck pass her. She watched the truck drive by, still at a high rate of speed, and saw it bump and skid along the road. Joan estimated the truck was traveling 90 m.p.h. She followed the vehicle from a distance, afraid there would be a fatality because the truck was proceeding recklessly in a residential area. Joan testified that she was not able to identify the driver of the white truck; "all [she] saw was black hair."

{¶7} Joan made it as far as a BP gas station when she saw smoke and a crash scene. The white truck was in the middle of the road in front of a pizza shop. A Kia Sportage was off to the side and people were tending to a woman inside the vehicle. Joan was the first witness to approach the white truck to check if there was anyone she could help. She did not see a driver inside the vehicle, and briefly wondered if the driver had exited the vehicle and fled. She could see a passenger seated inside the vehicle, head back, not moving.

{¶8} Joan came around the truck to approach the passenger door but there was a body lying in the road, by the door, blocking her access. Bystanders came up to move the person on the ground, but Joan told them not to touch him in case he had a spinal injury. She didn't attend further to the person laying in the street but saw the passenger move his head a little so she knew he was still alive.

{¶9}   Kari Gonzalez was sitting on her front porch on South Main Street when she heard a loud roaring noise approaching from the south, as though a vehicle was approaching really fast.  Kari was concerned because her teenage daughter was walking home from a nearby Dairy Queen.  A white truck came into view, "barreling" past the BP station and past Kari's house.  The speed limit is 35 m.p.h. but Kari estimated the truck was traveling 90 m.p.h.  She watched as the truck went out of control, swerving to the right as if to go up over a curb.  The driver overcorrected and the truck went left of center, crashing into the oncoming SUV driven by Kelly Potoczny.  Kari called 911 and went to the scene to offer assistance.

{¶10} Oliver Cline was driving on South Main and was close to the pizza shop when he saw a white truck come "flying" around the BP station.  Cline saw the truck lose control and go left of center, striking the Kia SUV and spinning toward Oliver's vehicle. Oliver was able to jump the curb and drive his own vehicle onto the sidewalk to avoid a collision, and the white truck spun past him.  Debris from the crash struck Oliver's vehicle and he saw a large toolbox fly out of the back of the truck.  The flying toolbox struck a post on a nearby house, splintering it.

{¶11} When Oliver got out of his car, he saw a man lying beside the passenger side of the truck within seconds of the impact.  Oliver could not identify the driver of the truck and he could not see inside the truck.

{¶12} Ptl. Thayne Telquist was the first police officer on the scene of the crash. He described the scene as "looking like a bomb went off," chaotic and spread over two city blocks, with debris and glass scattered everywhere.  The debris field included a cooler and empty beer cans.  Bystanders approached him and said people were picking up tools

from the street and running off with them, so Telquist secured the scene in preparation for arrival of crash reconstructionists. The people injured in the crash were being treated and Telquist did not interfere with treatment. He observed a body lying beside the passenger side of the truck and noted the rear window of the pickup truck was shattered and completely broken out.

{¶13} EMTs advised Telquist that the driver "reeked" of alcohol. Once the crash scene was secure, Telquist went to the hospital. Appellant was still unconscious and Telquist could not immediately make contact with him. Ross Wind was in a separate room in the E.R., also being treated, but he was conscious and alert.

{¶14} Telquist brought an Ohio State Highway Patrol (OSHP) blood draw kit with him to the hospital, intending to obtain a sample of appellant's blood for testing. Daren Jones, a registered nurse in the emergency room, performed the blood draw in front of Telquist. Jones drew a smaller sample than usual because appellant had lost blood due to treatment. Telquist secured the sample and mailed it to the OSHP Crime Lab, where it was tested by a toxicologist. Appellant's blood alcohol level was determined to be .182 grams by weight per 100 milliliters of whole blood.

{¶15} Sgt. Paul Lamadue is a crash reconstructionist with the Mansfield Police Department. He testified that the driver was ejected from the vehicle through the rear window. Appellant was the individual found lying beside the truck and he was the only occupant of the vehicle with lacerations to his head. Lamadue surmised appellant sustained these when he was ejected out the rear window of the truck. Lamadue also testified appellant was not wearing his seat belt.

{¶16} Trooper Adam Topp of the OSHP also investigated the crash. Based upon his investigation, he determined that the truck was traveling fast on South Main Street. The truck started to rotate counterclockwise as appellant lost control; the truck was almost sideways when it struck the Kia Sportage. The truck came up on two wheels during the crash although it did not roll over. The passenger side of the Silverado struck the Kia, and the Kia rotated counterclockwise, coming to rest against a curb. Topp testified that the skid marks left by the Silverado were 235.07 feet, indicating the truck was traveling extremely fast and made an enormous impact. Topp extracted the "black box" from the Silverado, which revealed that 5 seconds before the crash, the truck was traveling 82 m.p.h. and the driver was not braking at all; 4 seconds before the crash, the truck traveled at 81 m.p.h. with no braking; and 3 seconds before the crash, the truck was traveling 66 m.p.h. and the driver activated the brake. The black box also confirmed that the driver was not restrained, i.e., was not wearing a seat belt. Topp testified that the speed of the vehicle alone constituted recklessness which created a "substantial risk of death."

{¶17} Kelly Potoczny was seriously injured in the crash. Her injuries required knee surgery and she sustained a fractured spine which could not be surgically corrected. She missed 16 weeks of work and was still on medication and in physical therapy at the time of trial. She lost a job that required her to be active because her mobility is limited as a result of the crash.

{¶18} Ross Wind was also seriously injured. He awoke in the hospital with a broken jaw, broken clavicle, and broken ribs. His injuries required surgery on his jaw, and he has a plate and screw in his jaw and a plate and screw in his shoulder.

{¶19} Appellant was charged by indictment as follows: Count I, aggravated vehicular assault pursuant to R.C. 2903.08(A)(1)(a), a felony of the third degree [victim Kelly Potoczny]; Count II, vehicular assault pursuant to R.C. 2903.08(A)(1)(a), a felony of the third degree [victim Ross Wind]; Count III, O.V.I. pursuant to R.C. 4511.19(A)(1)(a) and (G)(1)(a), a misdemeanor of the first degree; and County V, aggravated vehicular assault pursuant to R.C. 2903.08(A)(2)(b), a felony of the fourth degree [victim Kelly Potoczny].[1]

{¶20} Appellant initially entered pleas of not guilty, but on November 16, 2016, he changed his pleas to guilty upon Counts I and II, and the remaining counts were dismissed. The matter was scheduled for sentencing on January 4, 2017.

{¶21} On December 20, 2016, however, appellant filed a motion to: 1) continue the sentencing date; 2) "appoint an independent medical examination" (*sic*); and 3) "to request to have victim Kelly Jo Potoczny observe the residence of [appellant]."[2] Appellee filed a response in opposition.

{¶22} On December 29, 2016, a substitution of defense counsel was filed. Also on that date, new defense counsel filed a motion to withdraw appellant's guilty pleas. On January 4, 2017, the trial court overruled appellant's motion of December 20, 2016.

{¶23} On February 13, 2017, the trial court granted appellant's motion to withdraw his guilty pleas and scheduled the matter for trial by jury. Appellant moved for, and the trial court granted, a forensic examination of his mental state.

---

[1] Count IV, a second count of O.V.I., was dismissed.
[2] Although not stated in appellant's motion, appellee's response and the ruling of the trial court note this motion was an attempt to obtain mitigating evidence for the sentencing hearing about appellant's severe medical conditions and the victim's position that she wanted him sentenced to a prison term.

{¶24} On March 16, 2017, by leave of court, appellant filed a motion to suppress challenging the warrantless blood draw and the procedures used to analyze the blood. Appellant also argued summarily that there was no reasonable suspicion to investigate the matter as an O.V.I. An evidentiary hearing was held on May 30, 2017 and July 28, 2017. The hearing largely focused on the blood test and included the testimony of an O.S.P. Crime Lab criminalist and a defense forensic toxicologist who challenged the criminalist's results.

{¶25} On August 11, 2017, the trial court overruled appellant's motion to suppress.

{¶26} The matter proceeded to trial by jury and appellant was found guilty as charged upon Counts I, II, III, and V.

{¶27} On January 2, 2018, appellant filed a motion for new trial pursuant to Crim.R. 33(A)(2). Defense trial counsel attached his own affidavit attesting to circumstances of witness misconduct exacerbated by ex parte communication between the trial court and the prosecutor. The affidavit stated that an expert witness (Dr. Forney) testified at trial on December 19, 2017, that he had reviewed appellant's medical records. The trial court judge called defense trial counsel the next day, a day on which the trial was not taking place, regarding a subpoena for medical records. During a telephone conversation, the trial court told defense trial counsel that the prosecutor spoke to the trial court about signing a subpoena for appellant's medical records and this contact was ex parte with no prior notice to defense trial counsel. Defense trial counsel was provided with the medical records on December 21, 2017. The affidavit further avers:

* * * *.

10. After discussions off the record, it was agreed that the medical records of [appellant] would not be utilized by [appellee] or admitted into evidence;

11. The actions of [appellee] in obtaining the medical records of [appellant] after the expert witness had testified, appeared to be a clear indication that [appellee] did not have the record prior to Dr. Forney's testimony and Dr. Forney did not, in fact, review the medical records of [appellant] as testified.

12. [Appellee], knowing Dr. Forney's testimony to be untruthful, allowed the testimony of Dr. Forney to go forward.

* * * *.

{¶28} Appellee filed a response in opposition, arguing the issue of requesting the subpoena from the trial court was administerial and further stating:

* * * *.

With respect to [appellant's] allegation that Dr. Forney's testimony was untruthful, prior to trial, Dr. Forney prepared a report regarding [appellant's] blood alcohol level at the time of the crash. On the cover page of that report was a list of items he reviewed in preparing that report. That report and cover page were given to [appellant]. During cross examination, Dr. Forney was asked a series of rapid-fire questions requiring him to affirm he reviewed those items. When asked if he reviewed defendant's medical records, though it was not on the list, Dr. Forney stated that he had reviewed them. Though

opposing counsel had the report and cover page in hand and a full

opportunity to inquire further on the matter, he chose not to do so.

\* \* \* \*.

{¶29} A substitute trial judge heard the argument on the motion for new trial and sentenced appellant. Pursuant to Judgment Entry dated January 22, 2018, the (substitute) trial court overruled the motion for new trial.

{¶30} Also on January 22, 2018, appellant was sentenced to, e.g., an aggregate prison term of four years.

{¶31} Appellant now appeals from the judgment entry of his convictions and sentence, and from the trial court's decision overruling his motion for new trial.

{¶32} Appellant raises two assignments of error:

**ASSIGNMENTS OF ERROR**

{¶33} "I. THE TRIAL COURT ERRED IN NOT GRANTING THE APPELLANT'S MOTION FOR A NEW TRIAL PURSUANT TO OHIO CRIMINAL RULE 32(A)(2)."

{¶34} "II. THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S MOTION TO SUPPRESS."

**ANALYSIS**

I.

{¶35} In his first assignment of error, appellant argues the trial court should have granted his motion for new trial. We disagree.

{¶36} Crim.R. 33 governs new trials. A motion for a new trial made pursuant to Crim.R. 33 is addressed to the sound discretion of the trial court and may not be reversed unless we find an abuse of discretion. *State v. Schiebel,* 55 Ohio St.3d 71, 75, 564 N.E.2d

54 (1990). An abuse of discretion implies that the trial court's judgment is arbitrary, unreasonable, or unconscionable. *State v. Sage,* 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987). A new trial should not be granted unless it affirmatively appears from the record that a defendant was prejudiced by one of the grounds stated in the rule or was thereby prevented from having a fair trial. *State v. Samatar,* 152 Ohio App.3d 311, 2003-Ohio-1639, 787 N.E.2d 691, ¶ 35 (10th Dist.).

{¶37} In the instant case, appellant moved for a new trial pursuant to Ohio Crim. R. 33(A)(2), which states, "A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights: [m]isconduct of the jury, prosecuting attorney, or the witnesses for the state[.]" Specifically, the motion was premised upon 1) an allegation by defense trial counsel that the trial court had an improper ex parte communication with the prosecutor, and 2) an allegation that one of appellee's experts testified untruthfully that he had reviewed appellant's medical records when in fact he had not.

{¶38} Appellant's argument implies appellee subpoenaed his medical records mid-trial to "protect" Forney, who had already testified he reviewed the medical records but (allegedly) could not have done so because appellee had not yet received the medical records. Further, the trial court was a party to this subterfuge in signing appellee's requested subpoena without defense trial counsel's knowledge.

{¶39} We note this premise is based entirely upon speculation and is not supported by any evidence in the record. Speculation does not establish ex parte communication has occurred where there is no evidence thereof. See, *State v. Johnson*, 2nd Dist. No. 04-CA-126, 164 Ohio App.3d 792, 2005-Ohio-6826, 844 N.E.2d 372, ¶ 32;

see also, *State v. Ismail*, 9th Dist. Summit No. 15007, 1991 WL 161351, *2, appeal not allowed, 62 Ohio St.3d 1494, 583 N.E.2d 966 (1992). The motion for new trial was argued before a different judge, but no evidence was admitted. The parties agree upon the essential facts. Forney testified at trial on December 19. On December 20, the prosecutor asked the trial judge to sign a subpoena for "medical records;" the trial judge called defense trial counsel but counsel was unavailable; defense trial counsel and the trial judge later spoke (without the prosecutor), the trial court advised counsel of the subpoena, and defense trial counsel argued the statute appellee relied upon was unconstitutional. Ultimately the "medical records" were obtained and disclosed to defense trial counsel, but were not entered as evidence at trial. Neither the subpoena nor the medical records obtained are before us. The description of "medical records" is broad and it is not evident in either party's argument what "medical records" specifically were at issue.

{¶40} Nor is it apparent to us that Forney "testified untruthfully" about reviewing the "medical records" prior to formulating his expert opinion. Our review of the record indicates Forney's testimony was ambiguous about "medical records" and does not support appellant's premise that he lied. The ambiguity arises from the same lack of specificity about what "records" the parties are referring to. When asked on cross examination whether he reviewed the "records" of appellant, Forney responded, "What I reviewed is listed here. If there's something not listed here, then I didn't review it." T. IV, 461. The trial court interjected, asking defense counsel, "Are you talking medical records?" and counsel responded, "Medical records." Forney then answered, "No, I

received MedCentral Health System records." He "believed" the records to be appellant's but he didn't recall anything about the content of the records.[3]  T. IV, 461-462.

{¶41} Appellant had the opportunity to further challenge Forney's credibility on this point and did so.  In closing argument, defense trial counsel stated:

> * * * *.  And [Dr. Forney] says yes, John Thompson was under the influence.  No.  The person whosever blood was tested was under the influence (*sic*).  That would be fair and impartial and unbiased and non-prejudicial.  If it was, in fact, Mr. Thompson's blood that was tested, then Mr. Thompson was under the influence.  Okay.  He doesn't give that opinion.  So I throw out the question, "Did you review Mr. Thompson's medical records?
>
> "Well, yes, I did."
>
> Bull.  His report's in there.  It says what records he reviewed.  He made this whole expert report without reviewing the records.  It's in the exhibit.  His report's in here.  And his report indicates that he reviewed medical records of Kelly Potoczny and Ross Wind, but he didn't review any medical records of John Thompson, yet he told you he did.  That's the length that these hired guns will go to so that they can get hired again on more cases to come in and testify the way they do. * * * *.
>
> T.(V.), 587-588.

---

[3] Forney's response that he "believed" the records to be those of appellant arose in the context of the defense theory of misidentification of the driver of the truck, and appellant's insinuations that not only was Wind the driver but perhaps the blood sample was drawn from Wind in the E.R. because of an error Telquist made in his report about the driver wearing khaki shorts.

{¶42} Whether or not Forney reviewed "records" is not apparent from our review, but in the context of appellant's assignment of error, this matter is not the basis for a new trial. Improper ex parte communications between a party and the trial court potentially create an appearance of impropriety and partiality that violates the Code of Judicial Conduct and a criminal defendant's due process rights. *State v. Johnson*, 164 Ohio App.3d 792, 2005-Ohio-6826, 844 N.E.2d 372, ¶ 27 (2nd Dist.), citing *Disciplinary Counsel v. O'Neill,* 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286. In *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, at ¶ 161, the Ohio Supreme Court noted that the Code of Judicial Conduct, Canon 3(B)(7) specifies, "A judge shall not initiate, receive, permit, or consider communications made to the judge outside the presence of the parties or their representatives concerning a pending or impending proceeding * * *." Therefore, a trial judge and prosecutor should have known that ex parte assistance in the preparation of the court's sentencing opinion was "wholly inconsistent with these vital ethical constraints." *Id.*, citing Disciplinary Rule 7–110(B)(2) and (3).

{¶43} Counsel is also forbidden to communicate *ex parte* with the trial judge:

> * * *.
>
> (B) In an adversary proceeding, a lawyer shall not communicate, or cause another to communicate, as to the merits of the cause with a judge or an official before whom the proceeding is pending, except:
>
> (1) In the course of official proceedings in the cause.
>
> (2) In writing if he promptly delivers a copy of the writing to opposing counsel or to the adverse party if he is not represented by a lawyer.

(3) Orally upon adequate notice to opposing counsel or to the adverse party if he is not represented by a lawyer.

(4) As otherwise authorized by law.

DR 7–110.

{¶44} In the instant case, appellee argues the conversation with the trial court about signing a subpoena for "medical records" did not go to the merits of the case. Based on the record before us, we agree with that characterization and note further that the trial court called defense trial counsel during the communication, although counsel was not available for conversation until after the subpoena was signed. We find counsel was given notice of the communication. In *State v. Sanders*, 188 Ohio App.3d 452, 2010-Ohio-3433, 935 N.E.2d 905,  at ¶ 19 (10th Dist.), the Tenth District Court of Appeals examined the nature of an "ex parte communication:"

> * * * *.  When a party complains that his due-process rights were violated due to the other party's communication with the trial court, the complaining party must first produce some evidence that the communication was actually ex parte. See *State v. Jenkins*, [15 Ohio St.3d 164, 236-37, 473 N.E.2d 264 (1984)]. An ex parte communication has been defined by some courts as an act done without notice to an adversely interested party. See *Keller v. Keller,* [4th Dist. Jackson No. 02CA19, 2003-Ohio-6462, ¶ 27, fn. 3], citing Black's Law Dictionary (5th Ed.1979); *State v. Boddie* , [3d Dist. Allen No. 1-2000-72, 2001 WL 1023107 (Sept. 6, 2001)], citing Black's Law Dictionary (6th Ed.1990) (an action is ex parte when it is

taken or granted at the instance and for the benefit of one party only, and without notice to, or contestation by, any person adversely interested); *Metzger v. Thurman*, [4th Dist. Scioto No. 92 CA 2106, 1993 WL 278495, fn. 5 (July 27, 1993)], citing *D'Acquisto v. Washington*, [640 F.Supp. 594, 621 (N.D.Ill.1986)] (an ex parte communication is a communication about a case that an adversary makes to the decision maker without notice to an affected party). Here, the prosecutor sent a contemporaneous copy of the e-mail it sent to the court to appellant's counsel as well. Thus, appellant had notice of the communication. Accordingly, pursuant to the definitions used in cases like *Keller, Boddie*, and *Metzger*, the e-mail sent by the prosecutor to the trial court would not be considered ex parte. See *Keller* at ¶ 27, fn. 3 (letter sent from counsel to magistrate was not an ex parte communication because counsel gave notice to the other party by forwarding a copy to the other party's counsel).

{¶45} In the instant case, the trial court called defense trial counsel to advise of the signing of the subpoena. We will not further speculate on the merits of the subpoena or the purpose for which it was sought. It is undisputed that the records obtained via the subpoena were provided to appellant, were not used at trial, and were not entered into evidence by either party.

{¶46} Appellant has therefore failed to show any prejudicial impact. "Even if an ex parte communication occurs, the complaining party must still show some prejudicial impact from the ex parte communication." *Sanders*, supra, 2010-Ohio-3433 at ¶ 20, citing

*State v. Lyons,* 11th Dist. Ashtabula No. 2001-A-0056, 2003-Ohio-3494, ¶ 28, reversed on other grounds in *State v. Lyons,* 101 Ohio St.3d 94, 2004-Ohio-27, 801 N.E.2d 458 (even if prosecutor's letter to judge was ex parte, the defendant failed to show that any prejudice occurred as a result of the letter); *State v. Hall* , 9th Dist. Medina No. 2770-M, 1999 WL 157427 (Mar. 3, 1999), citing *Smith v.  Flesher* , 12 Ohio St.2d 107, 233 N.E.2d 137 (1967), paragraph one of the syllabus (it is fundamental that to demonstrate reversible error on appeal, one must show not only that an error was committed but also that the error resulted in prejudice); *State v. Mira* , 6th Dist. No. H-97-032, 1998 WL 422278 (July 24, 1998) (appellant did not show any prejudice from the alleged ex parte communications between the trial judge and her former landlord).

{¶47} We do not discern, and appellant does not point out, how appellant was prejudiced by the alleged ex parte communication.  The point that appellant wanted to make—that Forney purportedly did not review his "medical records" before preparing his report—was made before the jury upon cross examination and in closing argument.  We are unable to find that the communication resulting in the subpoena had any prejudicial impact.  *State v. Schillinger*, 5th Dist. Stark No. 9492, 1994 WL 728649, *3 ["Our review of the record leads us to conclude that although there was apparently an *ex parte* communication between the prosecutor and the trial court, nevertheless, Appellant has not demonstrated how that regrettable incident had affected his ability to present an effective defense."]; see also, *State v. Warwick*, 12th Dist. Preble No. CA2017-01-001, 2018-Ohio-139; *State v. Brown*, 8th Dist. Cuyahoga No. 52757, unreported, 1987 WL 18253.

{¶48} Considering the totality of the circumstances and the entire record, the trial court's decision overruling the motion for new trial is neither unreasonable, arbitrary, nor unconscionable, and the trial court did not abuse its discretion.

{¶49} Appellant's first assignment of error is therefore overruled.

II.

{¶50} In his second assignment of error, appellant argues the trial court should have sustained his motion to suppress on the basis of probable cause to arrest. We disagree.

{¶51} Appellate review of a trial court's decision to deny a motion to suppress involves a mixed question of law and fact. *State v. Long,* 127 Ohio App.3d 328, 332, 713 N.E.2d 1 (4th Dist.1998). During a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and to evaluate witness credibility. *State v. Brooks,* 75 Ohio St.3d 148, 154, 661 N.E.2d 1030 (1996). A reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Medcalf,* 111 Ohio App.3d 142, 145, 675 N.E.2d 1268 (4th Dist.1996). Accepting these facts as true, the appellate court must independently determine as a matter of law, without deference to the trial court's conclusion, whether the trial court's decision meets the applicable legal standard. *State v. Williams,* 86 Ohio App.3d 37, 42, 619 N.E.2d 1141 (4th Dist.1993), overruled on other grounds.

{¶52} There are three methods of challenging a trial court's ruling on a motion to suppress on appeal. First, an appellant may challenge the trial court's finding of fact. In reviewing a challenge of this nature, an appellate court must determine whether

the trial court's findings of fact are against the manifest weight of the evidence. See, *State v. Fanning,* 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); *State v. Klein,* 73 Ohio App.3d 486, 597 N.E.2d 1141 (1991). Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. See, *Williams,* supra.

{¶53} Finally, an appellant may argue the trial court has incorrectly decided the ultimate or final issues raised in a motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry,* 95 Ohio App.3d 93, 96,620 N.E.2d 906 (8th Dist.1994).

{¶54} In the instant case, appellant contends Telquist had no probable cause to arrest him for O.V.I. and further argues summarily that he was not the subject of a valid arrest which would trigger the provisions of implied consent. We note that we reviewed a similar argument in *State v. Hollis*, 5th Dist. Richland No. 12CA34, 2013-Ohio-2586. We will therefore review appellant's two arguments in reverse.

{¶55} Appellant implies the blood draw was improper because he was not "arrested" as he lay unconscious in the emergency room. The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution prohibit the government from conducting unreasonable searches and seizures of persons or their property. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Specifically, the Fourth Amendment protects persons against unjustified or improper intrusions into a person's privacy, including bodily intrusion. See *State v. Gross,* 5th Dist. No. CT 96–055

(May 24, 1999), citing *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

{¶56} It is well-established that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The United States Supreme Court has recognized that the Fourth Amendment's "proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Winston v. Lee,* 470 U.S. 753, 760, 105 S.Ct. 1611, 84 L.Ed.2d 662(1985), quoting *Schmerber,* supra, at 768. However, "a suspect, upon request of a police officer, may voluntarily consent to submit to a blood test to determine the concentration of alcohol in his or her blood. Such consent constitutes actual consent* * *." *Fairfield v. Regner,* 23 Ohio App.3d 79, 85, 491 N.E.2d 333 (12th Dist.1985).

{¶57} Ohio's statutory implied consent law is found in R.C. 4511.191(A)(2), which states in pertinent part:

> Any person who operates a vehicle * * * upon a highway or any public or private property used by the public for vehicular travel or parking within this state or who is in physical control of a vehicle * * * shall be deemed to have given consent to a chemical test or tests of the person's whole blood, blood serum or plasma, breath, or urine to determine the alcohol, drug of abuse, controlled substance, metabolite of a controlled substance, or combination content of the

person's whole blood, blood serum or plasma, breath, or urine *if arrested for a violation of division (A) or (B) of section 4511.19 of the Revised Code,* section 4511.194 of the Revised Code or a substantially equivalent municipal ordinance, or a municipal OVI ordinance. (Emphasis added).

{¶58} Appellant summarily argues in the instant case that he was not "arrested," implying that the "implied consent to testing" provisions of R.C. 4511.191 are therefore not applicable. In *State v. Whitt,* we reiterated the principle that an arrest occurs when four elements are present: (1) an intent to arrest, (2) under real or pretended authority, (3) accompanied by actual or constructive seizure or detention of the person, and (4) which is so understood by the person arrested. 5th Dist. Licking No. 10–CA–3, 2010–Ohio–3761 at ¶ 14, citing *State v. Darrah,* 64 Ohio St.2d 22, 412 N.E.2d 1328 (1980). We also referenced our decision in *State v. Kirschner,* 5th Dist. Stark No. 2001 CA00107, 2001–Ohio–1915, for the proposition that "'a valid arrest must precede the seizure of a bodily substance, including a blood draw, and must precede an implied consent given based upon Form 2255.'" *Id.* at ¶ 18, quoting *State v. Rice,* 129 Ohio App.3d 91, 98, 717 N.E.2d 351 (7th Dist.1998).

{¶59} We have also recognized, however, the reality of constructive arrest, particularly in cases such as the one sub judice in which the subject of the drunken driving investigation is hospitalized or undergoing treatment and arrest per se is not feasible. *Hollis*, supra, at ¶ 25. That doesn't mean the investigation stops. *Id.* In *State v. Groves,* 5th Dist. Fairfield No. 10CA18, 2010–Ohio–5089, the driver was hospitalized when he was questioned by the officer and read the BMV 2255; the driver was never

taken into "custody" as such because he was undergoing medical treatment and there was no time for a citation to be issued. Nevertheless, we found as follows:

> Despite this court's holding in *State v. Kirschner,* [5th Dist.] No.2001CA00107, 2001–Ohio–1915, the administrative regulations in the case sub judice were fulfilled. Appellant was told he was under arrest. A citation would have been issued at the hospital but for appellant's medical emergency. To disallow the results of the blood draw because of the intervening urgent circumstances would place form over substance. The purpose of the mandatory language of the implied consent law is to inform the suspect of his various rights under 4511.191 and the administrative license provisions for non-consent. The language contained in the BMV 2250 form was sufficient to establish an "arrest."

> *State v. Groves,* 5th Dist. Fairfield No. 10CA18, 2010–Ohio–5089, ¶ 19.

{¶60} We find Telquist's request for the blood draw in the E.R. contemporaneous with appellant's constructive arrest complied with R.C. 4511.191(A)(2) and is reasonable under the Fourth Amendment. See, *Hollis*, supra, at ¶ 28; *State v. May,* 5th Dist. Morrow No.2010CA1, 2010–Ohio–4594, ¶ 22, appeal not allowed, 127 Ohio St.3d 1547, 2011–Ohio–647, 941 N.E.2d 803.

{¶61} Appellant further argues, though, that no probable cause existed to arrest him for O.V.I., and we disagree. A police officer has probable cause for an arrest if the facts and circumstances within his knowledge are sufficient to cause a reasonably

prudent person to believe that the defendant has committed the offense. *State v. Cummings,* 5th Dist. Stark No.2005–CA–00295, 2006–Ohio–2431, ¶ 15, citing *State v. Heston,* 29 Ohio St.2d 152, 280 N.E.2d 376 (1972). In making this determination, the trial court must examine the totality of facts and circumstances surrounding the arrest. See *State v. Miller,* 117 Ohio App.3d 750, 761, 691 N.E.2d 703 (11th Dist.1997); *State v. Brandenburg,* 41 Ohio App.3d 109, 111, 534 N.E.2d 906 (2nd Dist.1987). When evaluating probable cause to arrest for OVI, the totality of the facts and circumstances can support a finding of probable cause to arrest even where no field sobriety tests were administered. See *State v. Homan,* 89 Ohio St.3d 421, 427, 732 N.E.2d 952 (2000). Furthermore, a police officer does not have to observe poor driving performance in order to effect an arrest for driving under the influence of alcohol if all the facts and circumstances lead to the conclusion that the driver was impaired. See *State v. Harrop,* 5th Dist. Muskingum No. CT2000–0026, 2001 WL 815538 (July 2, 2001), citing *Atwell v. State,* 35 Ohio App.2d 221, 301 N.E.2d 709 (8th Dist.1973).

{¶62} As in *Hollis*, the egregious facts and circumstances of the instant case are replete with probable cause for appellant's constructive arrest for O.V.I. The uncontroverted evidence established appellant and Wind drank together for hours. The circumstances of the crash, which include appellant losing control at a high rate of speed, combined with the alcoholic beverage containers and a cooler scattered throughout the scene, plus appellant "reeking" of the odor of alcohol when he was treated by EMTs, constitute probable cause.

{¶63} Appellant's second assignment of error is overruled.

**CONCLUSION**

{¶64} Appellant's two assignments of error are overruled and the judgment of the Richland County Court of Common Pleas is affirmed.

By: Delaney, J.,

Wise, John, P.J. and

Wise, Earle, J., concur.